**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

|  |  |
|---|---|
| **HUDSON HOSPITAL OPCO, LLC,** *et. al.*, | |
| **Plaintiffs,** | **Civil Action No.: 22-4964 (ES) (JBC)** |
| **v.** | **OPINION** |
| **CIGNA HEALTH AND LIFE INSURANCE COMPANY,** *et. al.*, | |
| **Defendants.** | |

**SALAS, DISTRICT JUDGE**

Before the Court is Defendants Cigna Health and Life Insurance Co. and Connecticut General Life Insurance Co.'s (together, "Defendants" or "Cigna") motion to dismiss the Amended Complaint (D.E. No. 21 ("Am. Compl.")) of Plaintiffs Hudson Hospital OPCO, LLC d/b/a CarePoint Health—Christ Hospital; IJKGs, LLC; IJKG PROPCO LLC; and HUMC OPCO LLC d/b/a CarePoint Health—Hoboken University Medical Center, (together, "Plaintiffs" or "CarePoint"). (D.E. No. 25 ("Motion")). Having considered the parties' submissions, the Court decides this matter without oral argument. *See* Fed. R. Civ. P. 78(b); L. Civ. R. 78.1(b). For the following reasons, Defendants' motion is **GRANTED** and Plaintiffs' Amended Complaint is dismissed *without prejudice*.

## I.     BACKGROUND

### A.     Factual Background

Defendants "provide[] healthcare insurance, administration, and/or benefits to insureds or plan participants pursuant to a variety of health care benefit plans and policies of insurance, including employer-sponsored benefit plans and individual health benefit plans" (the "Plans" or

the "Cigna Plans").[1]  (Am. Compl. ¶ 4).  Plaintiffs are three affiliated hospitals located in New Jersey pursuing claims for benefits—which amount to millions of dollars—for thousands of beneficiaries of the Cigna Plans.  (*Id.* ¶¶ 23–25).  Importantly, up until June 1, 2021, Plaintiffs were out-of-network providers, meaning they did not "have contracts with [Cigna] to accept negotiated rates and instead, independently set their own fees for the health care services and supplies they deliver[ed] to their patients."  (*Id.* ¶¶ 34 & 37).  Plaintiffs allege that between March 15, 2016, and May 31, 2021, before they became in-network with Cigna,[2] Defendants underpaid and/or refused to pay Plaintiffs for claims submitted to Defendants for the emergency and elective services that Plaintiffs provided to subscribers of the Cigna Plans.  (*Id.* ¶¶ 5–7).

Plaintiffs make separate allegations regarding emergency and elective services.  Regarding elective services, according to Plaintiffs, the Cigna Plans contain certain pricing methodologies that determine how much Cigna will pay for out-of-network elective services.  Referencing only Cigna's website—and not the actual Plans themselves—Plaintiffs generally allege that all of the Cigna Plans in question "reimburse out-of-network elective treatment by reference to the Maximum Reimbursable Charge ('MRC')."  (*Id.* ¶ 78).  Plaintiffs allege that all Cigna Plans define MRC in one of three ways: "MRC-1," "MRC-2," or "Average Contracted Rate" ("ACR").  (*Id.* ¶ 79).

To start, according to Plaintiffs—who, again, refer only to Cigna's website—the Plans that follow the MRC-1 alternative define MRC-1 in the following manner:

> [A] data base compiled by FAIR Health, Inc. (an independent nonprofit company) is used to determine the billed charges made by health care professionals or facilities in the same geographic area for

---

[1]     Plaintiffs allege that some of the Plans at issue are employee benefit plans governed by the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.*, with other plans being governed by state law. (Am. Compl. ¶¶ 4–5).

[2]     Plaintiffs do not bring any claims originating after they became in-network with Cigna.

the same procedure codes using data.  The maximum reimbursable amount is then determined by applying a plan sponsor selected percentile (typically the 70th or 80th percentile) of billed charges, based upon the FAIR Health, Inc. data.  For example, if the plan sponsor has selected the 80th percentile, then any portion of a charge that is in excess of the 80th percentile of charges billed by providers in the FAIR Health, Inc. data base for the service in the same relative geographic area (as determined using the FAIR Health, Inc. data) will not be considered in determining reimbursement and the patient will be fully responsible for charges in excess of the MRC.

(*Id.* ¶ 80).  MRC-1 plans use the MRC-1 calculation to determine the reimbursement amount for out-of-network providers, but, Plaintiffs allege, MRC-1 plans will alternatively reimburse at the provider's billed charges "[i]f there is not enough FAIR Health charge data in a geographic area to determine a[n] MRC charge."  (*Id.* ¶ 81).  Thus, Plaintiffs allege that MRC-1 plans reimburse out-of-network providers at (i) the 70th or 80th percentile of billed charges based upon FAIR Health, Inc. data (the "Fair Health Number") or (ii) their billed charges.  (*Id.* ¶ 82).

Next, Plaintiffs allege that MRC-2 plans define MRC-2 as using

[A] schedule of charges established using a methodology similar to that used by Medicare to determine allowable fees for services within a geographic market.  This schedule amount is then multiplied by a percentage (110%, 150% or 200%) selected by the plan sponsor to produce the MRC.

(*Id.* ¶ 83).  Plaintiffs allege that MRC-2 plans state:

In the limited situations where a Medicare-based amount is not available (*e.g.*, a certain type of health care professional or procedure is not covered by Medicare or charges relate to covered services for which Medicare has not established a reimbursement rate), the MRC is determined based on the lesser of: the health care professional or facility's normal[3] charge for a similar service or supply; or the MRC-1 methodology based on the 80th percentile of billed charges.

---

[3]      Nowhere in the Amended Complaint do Plaintiffs allege the definition of "normal" under any of the Plans. They simply allege that their billed charges constitute their normal charges for all claims in this case.  (Am. Compl. ¶ 105).

(*Id.* ¶ 84).  Plaintiffs allege that "Cigna has not actually developed the 'schedule of charges' for any of the Plans that follow the MRC-2 alternative," and thus that for Plans that follow the MRC-2 alternative, MRC must be calculated based on the lesser of (i) the provider's normal charges or (ii) the MRC-1 Fair Health Number methodology.  (*Id.* ¶¶ 85–86).

Finally, Plaintiffs allege that ACR plans generally determine MRC based on the lesser of (i) the provider's normal charge or (ii) the Average Contracted Rate—"the average percentage discount applied to all claims in a geographic area paid by Cigna during a recent 6 month period for the same or similar service/supply provided by health care professionals or facilities participating in the Cigna provider network."  (*Id.* ¶ 87).  The Amended Complaint additionally alleges that under ACR plans, "[i]n some cases, the ACR amount will not be used and the MRC is determined based on the lesser of: the health care professional or facilities' normal charge for a similar service or supply; or the MRC-1 methodology based on the 80th percentile of billed charges." (*Id.* ¶ 89).  Plaintiffs further allege:

> Upon information and belief, based on the Plaintiffs' familiarity with in-network rates in Hudson County (and having recently negotiated in-network agreements with Cigna), the "Average Contracted Rate" within this definition yields the same reimbursement amount for each of the Underpaid Elective Claims as the amounts calculated using the MRC-methodology based on the 80th percentile of billed charges.

(*Id.* ¶ 88).  Thus, Plaintiffs allege that "for Plans that follow the ACR alternative, MRC is also calculated based on the lesser of [i] the provider's normal charges" or (ii) the MRC-1 Fair Health Number methodology.  (*Id.* ¶ 90).

In sum, Plaintiffs allege that under any of the three possible MRC formulations, "the Cigna Plans require Cigna to reimburse the CarePoint Hospitals based on their [i] normal charges, or [ii] the [Fair Health Number], less the patients' cost-sharing obligations under the Plans."  (*Id.* ¶ 159).

4

Plaintiffs claim that the payments Cigna has made to date clearly fall under this amount.  (*Id.* ¶ 160).

Regarding emergency services, Plaintiffs allege that Defendants failed to comply with the Affordable Care Act ("ACA").  (*Id.* ¶¶ 154–58).  In particular, Plaintiffs allege that Defendants failed to reimburse properly under the "Greatest of Three" regulation promulgated pursuant to the ACA and under ACA regulations limiting out-of-pocket maximums and subscriber cost-sharing. (*Id.*).  According to Plaintiffs, the ACA and its regulations mandate that Defendants (i) reimburse them for emergency services at at least the MRC under the applicable Plan, and (ii) hold subscribers harmless for emergency services above the Plan's out-of-pocket maximum.  (*Id.* ¶¶ 154–58).

Plaintiffs bring their claims for reimbursement on behalf of the Cigna subscribers for whom they provided care as assignees of the subscribers' rights under the Plans and due to the subscribers' contracts with Plaintiffs.  (Am. Compl. ¶¶ 148–153, 169, 174, 182 & 187).  In total, Plaintiffs allege that they were underpaid on 8,083 claims in violation of the Plans, amounting to over $135 million in damages.  (*Id.* ¶ 7).  According to the Amended Complaint, this damages number represents Plaintiffs' full billed charges for the allegedly underpaid claims, less an estimated patient cost-share for deductibles, coinsurance, co-payments, and Cigna's alleged payments to Plaintiffs to date.  (*Id.* ¶¶ 8–10).

To support their allegations, Plaintiffs attached to the Amended Complaint charts purporting to show the number of underpaid claims in the aggregate and by hospital, along with the sum total of the charges and the payments to date by Cigna on those claims.  (D.E. Nos. 21-1, 21-2, 21-3, 21-4, & 21-5).  They also attached a 165-page spreadsheet with an entry for each allegedly underpaid claim, with information for each claim including whether the care provided

was emergency or elective; the relevant dates; the total charges from Plaintiffs; the total Cigna payments; the expected payments (after patient responsibility); the percentage of expected payment paid; the balance due; and the patient's primary health insurance policy number, group number, and group name.  (D.E. No. 22).  Plaintiffs did not submit as an exhibit any of the Plans at issue.

### B.    Procedural History

Plaintiffs filed suit against Cigna on August 8, 2022, bringing claims under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 et seq, and state law, stemming from Cigna's alleged 8,083 underpayments.  (D.E. No. 1).  After Cigna filed a motion to dismiss the Complaint (D.E. No. 18), Plaintiffs filed an Amended Complaint on December 19, 2022 (Am. Compl.).  The Amended Complaint asserts the following claims against Defendants: (i) violations of ERISA § 502(a)(1)(B) (via 29 U.S.C. § 1132(a)(1)(B)) based on Defendants' underpayments of claims; (ii) violations of ERISA § 502(a)(3) (via 29 U.S.C. § 1132(a)(3)) based on Defendants' breach of the fiduciary duties of loyalty and due care; (iii) breach of contract; (iv) breach of the duty of good faith and fair dealing; (v) quantum meruit; (vi) violation of New Jersey Health Claims Authorization, Processing and Payment Act ("HCAPPA"); and (vii) promissory estoppel.  (Am. Compl. ¶¶ 147–218).  Cigna filed a motion to dismiss the Amended Complaint for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6).  (D.E. No. 25-1 ("Mov. Br.")).  The motion is fully briefed.  (D.E. No. 27 ("Opp. Br."); D.E. No. 29 ("Reply")).

## II.    LEGAL STANDARD

Under Rule 12(b)(6), a complaint may be dismissed, in whole or in part, for failure to state a claim upon which relief can be granted.  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its

face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* On a 12(b)(6) motion, the Court accepts "all well-pleaded allegations as true and draw[s] all reasonable inferences in favor of the plaintiff." *City of Cambridge Ret. Sys. v. Altisource Asset Mgmt. Corp.*, 908 F.3d 872, 878 (3d Cir. 2018). However, "threadbare recitals of the elements of a cause of action, legal conclusions, and conclusory statements" are all disregarded. *Id.* at 878–79 (quoting *James v. City of Wilkes-Barre*, 700 F.3d 675, 681 (3d Cir. 2012)). The burden is on the moving party to show that the plaintiff has not stated a facially plausible claim. *See Davis v. Wells Fargo*, 824 F.3d 333, 349 (3d Cir. 2016).

A complaint must also meet the pleading requirements of Rule 8. Rule 8 requires that a complaint set forth the plaintiff's claims with enough specificity to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 555 (internal quotation marks and citations omitted). Thus, the complaint must contain "sufficient facts to put the proper defendants on notice so that they can frame an answer" to the plaintiff's allegations. *See Dist. Council 47 v. Bradley*, 795 F.2d 310, 315 (3d Cir. 1986). As part of this notice pleading, a complaint must plead enough facts to "raise a reasonable expectation that discovery will reveal evidence of the necessary element." *Twombly*, 550 U.S. at 556.

In evaluating a plaintiff's claims, the Court considers the allegations in the complaint, as well as the documents attached thereto and specifically relied upon or incorporated therein. *See Sentinel Tr. Co. v. Universal Bonding Ins. Co.*, 316 F.3d 213, 216 (3d Cir. 2003); *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) ("[A] document integral to or explicitly relied upon in the complaint may be considered without converting the motion [to

dismiss] into one for summary judgment.") (quoting *Shaw v. Digit. Equip. Corp.*, 82 F.3d 1194, 1220 (1st Cir. 1996)) (internal quotation marks omitted)).

### III.    DISCUSSION

#### A.    Count I—Claims under Section 502(a)(1)(B)

Section 502(a)(1) provides that a "participant or beneficiary" of an ERISA plan may bring a civil action "to recover benefits due to h[er] under the terms of h[er] plan, to enforce h[er] rights under the terms of the plan, or to clarify h[er] rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B).  To state a claim for relief under § 502(a)(1)(B), a plaintiff "must demonstrate that the benefits are actually 'due'; that is, he or she must have a right to benefits that is legally enforceable against the plan." *Hooven v. Exxon Mobil Corp.*, 465 F.3d 566, 574 (3d Cir. 2006).  In order to plead sufficient facts to state a claim for relief, the plaintiff must identify a specific provision of the plan for which a court can infer this legally enforceable right.  *See, e.g., Atl. Plastic & Hand Surgery, PA v. Anthem Blue Cross Life & Health Ins. Co*., No. 17-4600, 2018 WL 1420496, at \*10 (D.N.J. Mar. 22, 2018); *Gotham City Orthopedics, LLC v. Cigna Health & Life Ins. Co.*, No. 21-1703, 2022 WL 2116864, at \*2 (D.N.J. June 13, 2022); *Metro. Neurosurgery v. Aetna Life Ins. Co.*, No. 22-0083, 2023 WL 5274611, at \*4 (D.N.J. Aug. 16, 2023); *Univ. Spine Ctr. v. Edward Don & Co., LLC*, No. 22-3389, 2023 WL 4841885, at \*6 (D.N.J. July 28, 2023).  A vague pleading that benefits are due is not sufficient.  *Emami*, 2021 WL 4150254, at \*5; *Atl. Plastic & Hand Surgery, PA*, 2018 WL 1420496, at \*10.  In addition, "several . . . decisions from this District have granted motions to dismiss in instances where a plaintiff has failed to tie his or her allegations of ERISA violations to specific provisions of an applicable plan."  *K.S. v. Thales USA, Inc.*, Case No. 17-7489, 2019 WL 1895064, at \*6 (D.N.J. Apr. 29, 2019).

To support their Section 502(a)(1) claim, Plaintiffs allege that Cigna was obligated under the Plans to pay some amount more towards the submitted claims in question than they have paid to date.[4]  (Am. Compl. ¶¶ 147–62).  In making this claim, Plaintiffs do not point to, describe, or quote any language from the actual Cigna Plans that, they claim, entitle them to reimbursement for elective services on the thousands of allegedly underpaid claims.  Instead, Plaintiffs generally allege, referencing only Cigna's website, that all of the Cigna Plans in question "reimburse out-of-network elective treatment by reference to the Maximum Reimbursable Charge ('MRC')."  (Id. ¶ 78).  As described above, Plaintiffs allege that all Cigna Plans define MRC in one of three ways: MRC-1, MRC-2, or ACR.  (Id. ¶ 79).  Plaintiffs allege that under any of these formulations, the Cigna Plans require Cigna to reimburse Plaintiffs at the lesser of (i) their normal charges or (ii) the Fair Health Number, minus the patients' cost-sharing obligations under the Plans.  (Id. ¶ 159).  Plaintiffs claim that the payments Cigna has made to date clearly fall under either amount.  (Id. ¶ 160).

Cigna contends that Plaintiffs have failed to sufficiently allege that they were entitled to greater payment from Cigna.  (Mov. Br. at 11–26).  More specifically, Cigna argues that Plaintiffs have failed to identify any specific provision within the Plans that confers upon the subscribers—and therefore Plaintiffs, as the subscribers' alleged assignees—a right to greater payment than they received.  (Id. at 12–15; Reply at 2).  Further, Cigna contends that Plaintiffs misconstrue the Plans' MRC formulas and fail to provide support for their allegation that all of the three possible formulas for defining the MRC require payment either at (i) Plaintiffs' normal charges or (ii) the Fair Health

---

[4]     How much more is not exactly clear.  Plaintiffs' damages allegation appears to suggest that they are owed their full billed charges on all claims, minus patient responsibility and what Cigna has already paid.  (Am. Compl. ¶¶ 8–10).  However, in their opposition brief Plaintiffs assert that they are not seeking reimbursement for their full billed charges.  (Opp. Br. at 1–2).  Instead, Plaintiffs appear to argue that they are owed at least the Fair Health Number.  (Opp. Br. at 1–2 & 17–18).  But nowhere do Plaintiffs indicate exactly what they allege Cigna was required to pay under the Plans or how exactly they propose that number be calculated for each of the 8,083 claims.

Number.  (Mov. Br. at 15–22).  Finally, Cigna argues that "Plaintiffs' alleged belief that they were

not reimbursed at the [Fair Health Number is] irrelevant to their claims, which seek reimbursement

for their full billed charges—not some other amount found in a third-party database."  (*Id.* at 21).

Plaintiffs respond that "at the pleading stage, the level of specificity needed to plausibly

allege plan terms is not high."  (Opp. Br. at 9).  They add that they have also plausibly alleged, in

regard to emergency services claims only, violation of the ACA, noting that "as an alternative to

the 'usual pattern of pointing to a breach of a specific provision written into the plan,' an ERISA

plaintiff may point to a breach of an obligation that is 'not an express but an implied term of the

plan, imposed as a matter of federal law.'"  (*Id.* at 9 (quoting *Open MRI and Imaging of RP

Vestibular Diagnostics P.A.*, No. 20-0345, 2022 WL 1567797, *3 (D.N.J. May 18, 2022)).  For

the reasons set forth below, the Court agrees with Cigna.

### a.  Elective Services

Plaintiffs have failed to state a claim under Section 502(a)(1)(B) in regard to elective

services because they have failed to identify the specific provisions of the specific Plans at issue

that confer the right to the payment they seek.  Instead, Plaintiffs point solely to the possible types

of plans listed on Cigna's website, rather than the Plans themselves.  Plaintiffs do not make any

attempt to allege what type of plan to which each of the individuals connected to the thousands of

underpaid claims at issue subscribed.  Rather, they only generally allege, based on information

gleaned from Cigna's website, that all of the Cigna Plans in question reimburse out-of-network

elective treatment by reference to the MRC, which is allegedly defined under all Cigna Plans in

one of three ways.  And they layer speculation upon speculation, offering nothing from the terms

of the Plans themselves, to support their allegations that all three of these methodologies result in

a payment of at minimum (i) their normal charges or (ii) the Fair Health Number.

This is plainly insufficient.  As stated above, judges in this district have required plaintiffs to do more than vaguely plead that benefits are due under the terms of the plan, *Emami*, 2021 WL 4150254, at *5, and courts have required plaintiffs to "tie [their] allegations of ERISA violations to specific provisions of an applicable plan."  *Thales*, 2019 WL 1895064, at *6.  Here, the Amended Complaint fails because nowhere do Plaintiffs tie their factual allegations to the specific provisions that, they say, entitle them to benefits.  *See, e.g.*, *id.* (noting that "several other decisions from this District have granted motions to dismiss in instances where a plaintiff has failed to tie his or her allegations of ERISA violations to specific provisions of an applicable plan").  And "[w]ithout this information, the [Amended Complaint] contains little more than an assertion that Plaintiff is owed more than it was paid for the services it provided," which is insufficient to withstand a motion to dismiss.  *Gotham City*, 2022 WL 2116864 at *2 ("Plaintiff's pleading fails to include relevant and critical terms of the Plan or Plans under which Plaintiff seeks payment— terms that are central to all of Plaintiff's claims and necessary for any meaningful review of their sufficiency."); *see also Atl. Plastic & Hand Surgery, PA v. Anthem Blue Cross Life & Health Ins. Co.*, No. 17-4600, 2018 WL 1420496, at *10 (D.N.J. Mar. 22, 2018) (dismissing "because the Complaint fails to identify any specific provision in the Plan from which the Court can infer that Plaintiffs were entitled to compensation at the 'usual and customary rate' for out-of-network medical services").

Indeed, "[o]nly the words of the Plan itself can create an entitlement to benefits."  *Hein v. F.D.I.C.*, 88 F.3d 210, 215 (3d Cir. 1996).  And, as stated above, Plaintiffs here have failed to plead any actual terms of the Plans that entitle them to the benefits they seek.  Accordingly, Plaintiff's § 502(a)(1)(B) claim must be dismissed.  *See Advanced Gynecology*, No. 19-2234, D.E. No. 119, at 2 (D.N.J. June 24, 2022) (Transcript of Bench Ruling) (hereinafter "*Advanced*

*Gynecology*"); *Univ. Spine Ctr.*, 2023 WL 4841885 at *6 ("Without accurately pleading the relevant provisions of the Plan which allegedly entitle Plaintiff to additional reimbursement, Plaintiff fails to state a claim."); *Sanctuary Surgical Ctr., Inc. v. UnitedHealth Grp., Inc.*, No. 10–81589–CIV, 2013 WL 149356, at *5–6 (S.D. Fla. Jan. 14, 2013).[5]

Plaintiffs' remaining arguments in support of their claim are unavailing.  Plaintiffs cite to a number of cases in their opposition brief that they claim support their position that they have sufficiently pleaded the Plans' terms.  (Opp. Br. at 9–11).  But those cases differ from this one in that the complaints at issue in the cited cases actually alleged plan terms—typically, that the plan or plans at issue required reimbursement at a specific rate—and provided factual allegations indicating that those terms had been violated, rather than pointing to terms on a website describing *potential* plans with provisions that *may* have been violated.  *See Metro. Surgical Inst., LLC v. Cigna*, No. 19-5827, 2020 WL 4432430, at *1 (D.N.J. July 31, 2020) (stating that plaintiff alleged that "under the Cigna Plans, Plaintiff is entitled to reimbursement for 'out-of-network' services rendered to Cigna Insureds at usual, customary, and reasonable rates"); *Gotham City Orthopedics, LLC v. United Healthcare Ins. Co.*, No. 21-9056, 2022 WL 3500416, *6 (D.N.J. Aug. 18, 2022) (noting that plaintiffs "cited Plan language"); *Advanced Orthopedics & Sports Medicine Inst. v.*

---

[5]    Underscoring the problems with relying on secondary sources describing possible plans, rather than the language of the Plans themselves, Plaintiffs' quotations in the Amended Complaint from Cigna's website regarding the plans differ from the current language on the site in ways critical to their claims.  For example, the current website defines the MRC-1 alternative differently such that Plaintiffs would be entitled to different benefits under the current website versus the website as quoted in the Amended Complaint.  *Compare, e.g.*, Am. Compl. ¶ 80 ("For the Plans that follow the 'MRC-1' alternative, the Plans define MRC-1 substantially as follows: '[A] data base *compiled by FAIR Health, Inc.* (an independent nonprofit company) is used to determine the billed charges made by health care professionals or facilities in the same geographic area for the same procedure codes using data. The maximum reimbursable amount is then determined by applying a plan sponsor selected percentile (typically the 70th or 80th percentile) of billed charges, based upon the FAIR Health, Inc. data.'" (citing https://www.cigna.com/legal/compliance/disclosures) (emphasis added)) *with Reimbursement for Out-of-Network Services*, CIGNA HEALTHCARE, https://www.cigna.com/legal/compliance/disclosures (last visited Sept. 14, 2023) ("Under [the MRC-1] option, *Cigna Healthcare selects a third-party database* that compiles billed charges made by health care professionals or facilities in a geographic area for the same procedure codes. The maximum reimbursable amount is then determined by applying a percentile (often the 70th or 80th percentile) of the billed charges reflected in the selected database." (emphasis added)).

*Anthem Blue Cross Life & Health Ins. Co.*, No. 20-3243, 2022 WL 13477952, *10 (D.N.J. Oct. 21, 2022) (stating that plaintiffs alleged actual plan terms); *Prof. Orthopedic Assocs., PA v. Excellus Blue Cross Blue Shield*, No. 14-6950, 2015 WL 4387981, *13 (D.N.J. July 15, 2015) (same).  As such, Plaintiffs' cited case law does not lead this Court to reach a contrary conclusion.

Rather, the Court finds that this case is much more similar to *Sanctuary Surgical Centre, Inc. v. UnitedHealth Group, Inc.*, No. 10-1589, 2013 WL 149356 (S.D. Fla. Jan. 14, 2013).  That case involved out-of-network benefits, and "at least 300 different health insurance plans governing 996 derivative ERISA benefit claims asserted on behalf of approximately 500 different patients." *Id.* at *1.  The court dismissed the ERISA benefits counts for failure to state a claim.  *Id.* at *3–7. The court noted that "plaintiffs must at least identify the specific plan provisions under which coverage is conferred with respect to *each* of the 996 derivative ERISA claims identified in its complaint, and to allege sufficient facts to plausibly show the services rendered to each patient were indeed covered under that *particular* plan."  *Id.* at *3.  The court found that plaintiffs had failed to do so, despite the fact that plaintiffs alleged that they "provided and cited specific language from six summary plan descriptions and two certificates of coverage which arguably encompass coverage for the . . . procedures at issue."  *Id.*  The court emphasized:

> The plaintiffs do not indicate in their complaint which of the 996 claims identified in the composite exhibit to the complaint correspond to which of the six exemplar summary plan descriptions or two certificates of coverage, or which correspond to other plans not cited or described in the complaint; do not attach the full plan documents governing the exemplar plans, and do not cite relevant portions of the "exclusionary" sections from the referenced exemplar plans.

*Id.* at *5.  The court found that "[w]ithout a precise description of the relevant coverage and exclusionary language of all plans, and no allegations showing how [the claims] fall within [the plans], plaintiffs fails [sic] to state plausible ERISA benefits claims upon which relief can be

granted." *Id.* at *6. As in *Sanctuary*, Plaintiffs here have failed to allege specific Plan terms, along with factual allegations indicating that those terms have been violated. Instead, they have opted to plead *en masse* thousands of claims under numerous Plans, without tying their factual allegations to the specific provisions that, they say, entitle them to benefits. Accordingly, like in *Sanctuary*, the Court finds that Plaintiffs' claims cannot survive. *See also Advanced Gynecology* at 2–3 (dismissing on an alternative ground but noting skepticism of mass-pled claims without reference to plan language).

Because Plaintiffs have failed to tie their allegations to specific Plan terms, their claims must be dismissed.[6]

### b. Emergency Services

In addition, Plaintiffs allege that they were underpaid for emergency services specifically based on regulations promulgated under the Affordable Care Act ("ACA").[7] Plaintiffs allege that under the ACA,[8] under the "Greatest of Three" regulation[9] promulgated pursuant to Section 2719A,

> a non-grandfathered plan must pay the greatest of three possible
> amounts for out-of-network emergency services: (1) the amount

---

[6] Plaintiffs' failure to identify specific plan provisions is especially concerning in cases such as this one, which was not brought as a class action and where thousands of claims have been conglomerated together with little or no effort to individualize them. This type of pleading raises the inference of claim-dumping and an attempt to circumvent restrictions applicable to formal class actions. *Cf. Sanctuary Surgical Ctr.*, 2013 WL 149356 at *7 ("[T]he court expresses serious reservation over the permissibility of the pursuit of the voluminous claims aggregated in this single proceeding under the Federal Rules of Civil Procedure. With nearly one thousand claims arising from separate transactions and occurrences aggregated in this proceeding, the plaintiffs' complaint appears to structure an impermissible way of circumventing the federal class action requirements, including the requirements of Rule 23.").

[7] Plaintiffs do not allege that Defendants violated the ACA in their repayment of elective services claims.

[8] Plaintiffs allege that the ACA's cost-sharing requirements "are expressly incorporated into group health plans covered by ERISA," citing 29 U.S.C. § 1185d(a). (Am. Compl. ¶ 52). Defendants do not contest this allegation.

[9] Plaintiffs note that "[t]he 'Greatest of Three' provision of the ACA was effectively superseded by provisions of the 'No Surprises Act,' which went into effect on January 1, 2022. (No Surprises Act, H.R. 3630, 116th Cong. (2019)). . . . However, since the Underpaid Claims arose prior to the effective date of the 'No Surprises Act,' the Greatest of Three regulation applies to all of the Underpaid Claims." (Am. Compl. ¶ 54 n.1). Defendants do not contest this allegation.

> negotiated with in network providers for the emergency service, accounting for in-network co-payment and co-insurance obligations; (2) the amount for the emergency service calculated using the same method the plan generally uses to determine payments for out-of network services (such as usual, customary and reasonable charges), but excluding any in-network co-payment and co-insurance imposed, and "without reduction for out-of-network cost sharing that generally applies under the plan or health insurance coverage with respect to out-of-network services"; or (3) the amount that would be paid under Medicare for the emergency service, accounting for in-network co-payment and co-insurance obligations.

(Am. Compl. ¶ 54 (quoting 29 C.F.R. § 2590.715-2719A(b)(3)(i)(A)–(C))).  Plaintiffs allege that

> Typically, the greatest of [the] three [specified] amounts will be the amount calculated using the same methodology the Plans generally use to determine payments for out-of-network services, but excluding any in-network co-payment and co-insurance imposed, and "without reduction for out-of-network cost sharing that generally applies under the plan or health insurance coverage with respect to out-of-network services."

(*Id.* ¶ 154 (quoting 29 C.F.R. § 2590.715- 2719A(b)(3)(i)(B))).  So, in essence, Plaintiffs allege that the Greatest of Three rule typically requires Defendants to reimburse for emergency services at the applicable MRC under the plan, just as for elective services.

Further, Plaintiffs allege that under C.F.R. § 2590.715-2719A(b)(3)(i) and C.F.R. § 2590.715-2719A(b)(3)(ii) (together, for simplicity, the "Out-of-Pocket Regulation"), "Cigna Plans are required to hold the Cigna Subscribers harmless above any annual Plan out-of-pocket maximums that apply generally to out-of-network benefits under the Plans."  (*Id.* ¶ 76).

As far as this Court can discern, Plaintiffs provide two arguments regarding the ACA.  First, that Defendants violated the Greatest of Three regulation by calculating Plaintiffs' reimbursement using "methodology [that] did not comport with the methodology the Plans generally used to calculate 'MRC' under the Plans."  (Opp. Br. at 14).  This is just a rephrasing of Plaintiffs' argument that Defendants did not calculate reimbursement properly under the Plans under any of

the MRC methodologies in regard to elective services, which, as already described above, the Court has rejected.  For the same reasons, the claim fails in regard to emergency services as well.

Plaintiffs' second argument regarding the ACA appears to be that under the Out-of-Pocket Regulation, Defendants were required to hold their subscribers harmless over the Plans' out-of-pocket maximums.  (Am. Compl. ¶¶ 157–58).  Specifically, Plaintiffs allege that Cigna's underpayments on emergency services claims left subscribers with balances due to Plaintiffs far above the out-of-pocket maximums of their Plans, violating the Out-of-Pocket Regulation.  (*Id.*).  Defendants counter that Plaintiffs have failed to allege that the subscribers in question were required by Cigna to pay any amount in *cost-sharing* above the out-of-pocket maximum, and that any amount the subscribers were forced to pay over the allowable charge under their plans constituted allowable *balance billing*.  (Mov. Br. at 24–25).  Plaintiffs oppose, insisting that subsection (b)(3)(ii) of the Out-of-Pocket Regulation limits balance billing.  (Opp. Br. at 14–15).  For the reasons set forth below, the Court agrees with Defendants.

The Out-of-Pocket Regulation contains two relevant sections.  29 CFR § 2590.715-2719A(b)(3)(i) states:

> Any cost-sharing requirement expressed as a copayment amount or coinsurance rate imposed with respect to a participant or beneficiary for out-of-network emergency services cannot exceed the cost-sharing requirement imposed with respect to a participant or beneficiary if the services were provided in-network.  However, a participant or beneficiary may be required to pay, in addition to the in-network cost sharing, the excess of the amount the out-of-network provider charges over the amount the plan or issuer is required to pay under this paragraph (b)(3)(i).

§ 2590.715-2719A(b)(3)(ii) adds:

> Any cost-sharing requirement other than a copayment or coinsurance requirement (such as a deductible or out-of-pocket maximum) may be imposed with respect to emergency services provided out of network if the cost-sharing requirement generally

16

applies to out-of-network benefits.  A deductible may be imposed with respect to out-of-network emergency services only as part of a deductible that generally applies to out-of-network benefits.  If an out-of-pocket maximum generally applies to out-of-network benefits, that out-of-pocket maximum must apply to out-of-network emergency services.

Plaintiffs' Out-of-Pocket Regulation allegations are insufficient to state a 502(a)(1)(B) claim.  As Defendants point out, the Out-of-Pocket Regulation limits *cost-share* owed by subscribers as a percentage of the allowable amount covered by the plan, *not* the total amount a subscriber is billed by the provider for an out-of-network charge.  *See* § 2590.715-2719A(b)(3)(i).  In general, a particular insurance plan's methodology determines the covered reimbursement amount for the subscriber's out-of-network emergency claim.  Of that amount, under the plan, the insurer is obligated to pay a certain percentage, with the subscriber being obligated to pay a certain percentage via copayment, coinsurance, or deductible.  The percentage of the covered amount that the subscriber must pay is called the cost-share.  *See* 29 C.F.R. § 2590.715-2713(a)(1).  "Balance billing"—the amount a subscriber is billed by the provider above the covered reimbursement amount determined by the plan, *see Middlesex Surgery Ctr. v. Horizon*, No. 13-112, 2013 U.S. Dist. LEXIS 27278, at *8, n.2 (D.N.J. Feb. 27, 2013*)*—is not a part of cost-share, *see, e.g.*, 42 U.S.C. § 18022(c)(3)(B) (excluding from the definition of cost-sharing under the Affordable Care Act "balance billing amounts for non-network providers").  In other words, a subscriber may be responsible not only for the cost-share obligation, but also the balance bill.

Under the Out-of-Pocket Regulation, the amount that the subscriber is obligated to pay *via cost-share* for out-of-network emergency services cannot exceed what it would be if the services were provided in-network.  *See* 29 CFR § 2590.715-2719A(b)(3)(i).  And the out-of-pocket maximum that the Plan applies to out-of-network services generally must be applied to the emergency claim, with Cigna holding the subscriber harmless above that out-of-pocket maximum

17

when it comes to paying *cost share* (i.e., the covered reimbursement amount dictated by the Plan). *See* 29 CFR § 2590.715-2719A(b)(3)(i).  But this does not mean that Cigna is obligated to pay the excess money charged by the provider that exceeds the reimbursement amount dictated by the Plan—i.e., the balance bill.  In fact, the Out-of-Pocket Regulation specifically states that "a participant or beneficiary *may* be required to pay, in addition to the in-network cost sharing, *the excess of the amount the out-of-network provider charges over the amount the plan or issuer is required to pay*."  *Id.* (emphasis added).

Plaintiffs argue that § 2590.715-2719A(b)(3)(ii)'s statement that "[i]f an out-of-pocket maximum generally applies to out-of-network benefits, that out-of-pocket maximum must apply to out-of-network emergency services" means that Cigna is required to hold subscribers harmless above the out-of-pocket maximum even when it comes to the balance bill.  (Opp. Br. at 14–15). But nothing in that section mentions balance billing at all—it refers solely to cost-share.  And the definition of cost-sharing in the ACA excludes "balance billing amounts for non-network providers."  *See* 42 USCS § 18022(c)(3)(B).  Indeed, one of the motivations behind the creation of the Greatest of Three regulation was the desire to ensure that "a reasonable amount [is] paid [to the provider] before a patient becomes responsible for a balance billing amount."  75 Fed. Reg. 37188, 37194 (June 28, 2010).  This clearly contemplates the continued legitimacy of leaving subscribers responsible for balance bills.  The plain text of the Out-of-Pocket regulation defeats Plaintiffs' argument that Cigna was required to hold subscribers harmless above the out-of-pocket maximum for the balance bill in addition to the cost-share.

Here, Plaintiffs have not alleged that subscribers were forced to pay, in terms of *cost-share* (rather than balance-billing), an amount above any applicable out-of-pocket maximums under the Plans.  They have thus failed to allege that Defendants violated the Out-of-Pocket Regulation.

### c.  Summary

In sum, Plaintiffs have failed to identify specific provisions of the Plans at issue that afford them the right to the benefits they seek.  And they have failed to sufficiently allege that Defendants violated the ACA.  Plaintiffs thus have failed to state a Section 502(a)(1)(B) claim, and all claims under Section 502(a)(1)(B) are to be dismissed.  This dismissal is *without prejudice*.

### B.    Count II—Claims under Section 502(a)(3)

In Count II, Plaintiffs bring claims for equitable relief under § 502(a)(3), alleging that Defendants violated their fiduciary duties by "failing to act prudently" in "failing to act in accordance with the documents governing the Plans," and violated their "fiduciary duties of due care and loyalty to the CarePoint Hospitals" by (i) "making benefit determinations for the purpose of enriching themselves," (ii) "using arbitrary methodologies" in determining payments owed to Plaintiffs, (iii) "not attempting in good faith to effectuate prompt, fair and equitable settlement of claims Plaintiffs' claims" and forcing CarePoint to resort to litigation, (iv) "violating applicable statutory and regulatory provisions governing the business of insurance," (v) using funds which should have been paid to CarePoint, and (vi) "ignoring its own ethical standards and claims-handling procedures, which require that a claims-handler discover and disclose all bases for finding—not avoiding—insurance coverage."  (Am. Compl. ¶¶ 163–68).

Defendants move to dismiss Plaintiffs' § 502(a)(3) claims on multiple bases.  First, Defendants argue that to the extent the § 502(a)(3) claims rely on the allegations made in the benefits claims, they fail because Plaintiffs have not plausibly alleged that Defendants did not follow Plan terms in paying them.  (Mov. Br. at 26–27).   Second, Defendants argue that the § 502(a)(3) claims should be dismissed because they are duplicative of the benefits claims, "because Plaintiffs seek the same relief under a fiduciary duty theory as their ERISA benefits theory."  *Id.*

at 26.  Plaintiffs respond that they have "amply alleged that [they were] underpaid under the Plans."

(Opp. Br. at 23).  They additionally argue that their § 502(a)(3) claims are not duplicative of their

benefits claims because they "challenge[] different conduct and seek[] different relief."  (*Id.* at 22).

For the reasons set forth below, the Court agrees with Defendants.

Plaintiffs' § 502(a)(3) claims all derive from the allegation that Defendants underpaid them

in violation of the relevant Plans—an allegation that, as described, Plaintiffs have failed to properly

plead.  All of Plaintiffs' claims for breach of fiduciary duty involve the Defendants not following

Plan provisions or procedures, improperly making benefit determinations under the Plans, refusing

to settle the benefits claims, violating laws in their application of the Plans' payment provisions,

and misusing funds which allegedly should have been used to pay Plaintiffs' benefits claims.[10]

But, as described above, Plaintiffs have not adequately alleged that Defendants violated any

provision of the Plans or underpaid Plaintiffs under any specifically identified provision of the

Plans.  Thus, Plaintiffs' § 502(a)(3) claims fail as well.  *See Advanced Gynecology* at 4 ("[T]wo of

Plaintiffs' theories of fiduciary breach—one, that Cigna failed to reimburse benefits, and two, that

Cigna engaged in self-dealing—fail because they have not plausibly pleaded that Cigna wrongfully

withheld benefits."); *cf. Plastic Surgery Ctr., P.A. v. Cigna Health and Life Ins. Co.*, No. 17–2055,

2018 WL 2441768, at *14, n.14 (D.N.J. May 31, 2018) ("[T]he Court has already ruled that

---

[10]     Plaintiffs appear to argue that their allegations that the Defendants "engaged in self-dealing, *inter alia*, by
making benefit determinations for the purposes of enriching [themselves] and [their] business partners at the expense
of Cigna's Subscribers and CarePoint as their assignees, and misusing funds which should have been paid to
CarePoint" are separate from their claim that Defendants underpaid them under the Plans.  (Opp. Br. at 23).  The Court
disagrees.  If Defendants followed the Plans in paying Plaintiffs—which, as described, Plaintiffs have not adequately
alleged that they failed to do—then their benefit determinations could not have been improper, and there would be no
funds that "should have been" paid to Plaintiffs.  Further, Plaintiffs' sparse allegations regarding "cost-containment
fees" fare no better.  Plaintiffs allege that "under its contracts with the Cigna Plans it administers, Cigna earns 'cost-
containment fees' calculated as a sizable percentage (up to 30%) of the amounts by which Cigna underpays the
CarePoint Hospitals." (Am. Compl. ¶ 198).  Accordingly, they appear to allege that Cigna engaged in self-dealing by
earning cost-containment fees based on its underpayments.  These allegations, however, are similarly unhelpful, as
again, Plaintiffs have not sufficiently alleged underpayment.  As such, the Amended Complaint contains no allegations
indicating that the self-dealing claim is separate from the underpayment claim.

Plaintiff has failed to adequately plead a negligent misrepresentation claim, and thus, this allegation cannot serve as the basis for Plaintiff's § 502(a)(3) claim.").  Plaintiffs' § 502(a)(3) claims are therefore DISMISSED without prejudice.[11]

### C.      State Law Counts

Plaintiffs' remaining claims—breach of contract (Count Three), breach of the duty of good faith and fair dealing (Count Four), quantum meruit (Count Five), violation of New Jersey Health Claims Authorization, Processing and Payment Act (Count Six), and promissory estoppel (Count Seven)—all fall under state law.  Because the Court is dismissing the only Federal claims in this case,[12] the Court declines to exercise supplemental jurisdiction over the remaining state law claims. 28 U.S.C. § 1367(c)(3) ("[T]he district court[ ] may decline to exercise supplemental jurisdiction [if] . . . the district court has dismissed all claims over which it has original jurisdiction."); *Demaria v. Horizon Healthcare Servs.*, No. 11-7298, 2012 WL 5472116, at *5 (D.N.J. Nov. 9, 2012) (dismissing ERISA claims without prejudice and declining to exercise supplemental jurisdiction over remaining state law claims); *Somerset Orthopedic Assocs., P.A. v. Horizon Healthcare Servs.*, No. 19-8783, 2021 WL 3661326, at *8–9 (D.N.J. Aug. 18, 2021) (same); *Borough of West Mifflin v. Lancaster*, 45 F.3d 780, 788 (3d Cir. 1995) ("[W]here the claim over which the district court has original jurisdiction is dismissed before trial, the district court must decline to decide the pendent state claims unless considerations of judicial economy, convenience, and fairness to the parties provide an affirmative justification for doing so.").

---

[11]     Because the Court finds that Plaintiffs have not adequately alleged their 502(a)(3) claims, the Court does not reach Defendants' remaining arguments in favor of dismissing this claim. (*See* Mov. Br. at 26–27)).

[12]     Jurisdiction in this case is premised solely on 28 U.S.C. § 1331.  (Am. Compl. ¶ 19).

## IV.    CONCLUSION

For the reasons stated above, Defendants' motion to dismiss is **GRANTED,** and this matter is dismissed *without prejudice*.  An appropriate Order follows.


**Dated: October 3, 2023**


_____
**Esther Salas, U.S.D.J.**