**K&L GATES LLP**
One Newark Center, Tenth Floor
Newark, New Jersey 07102
Tel:  (973) 848-4000
Fax:  (973) 848-4001

*Attorneys for Plaintiffs*

*Hudson Hospital OPCO, LLC, d/b/a CarePoint Health—Christ Hospital; IJKG, LLC, IJKG PROPCO LLC and IJKG OPCO LLC, d/b/a CarePoint Health—Bayonne Medical Center; and HUMC OPCO LLC, d/b/a CarePoint Health—Hoboken University Medical Center*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| HUDSON HOSPITAL OPCO, LLC—d/b/a CAREPOINT HEALTH—CHRIST HOSPITAL, IJKG, LLC; IJKG PROPCO LLC and IJKG OPCO LLC d/b/a CAREPOINT HEALTH—BAYONNE MEDICAL CENTER; and HUMC OPCO LLC d/b/a CAREPOINT HEALTH—HOBOKEN UNIVERSITY MEDICAL CENTER,<br><br>Plaintiffs,<br><br>v.<br><br>CIGNA HEALTH AND LIFE INSURANCE COMPANY and CONNECTICUT GENERAL LIFE INSURANCE COMPANY,<br><br>Defendants. | Hon. Esther Salas, U.S.D.J.<br><br>Hon. James B. Clark, III, U.S.M.J.<br><br>Civil Action No. 2:22-cv-04964-ES-JBC<br><br><br>**SECOND AMENDED COMPLAINT AND JURY DEMAND** |

For their Second Amended Complaint against Defendants, Cigna Health and Life Insurance Company ("Cigna Health") and Connecticut General Life Insurance Company ("Connecticut General") (collectively, "Defendants" or "Cigna"), Plaintiffs Hudson Hospital OPCO, LLC d/b/a CarePoint Health—Christ Hospital ("Christ Hospital"), IJKG, LLC, PROPCO LLC and IJKG OPCO LLC d/b/a CarePoint Health—Bayonne Medical Center ("BMC"), and HUMC OPCO LLC d/b/a CarePoint Health—Hoboken University Medical Center ("HUMC"), (collectively, "Plaintiffs" or the "CarePoint Hospitals"), by and through their attorneys, K&L Gates LLP, hereby allege as follows:

## INTRODUCTION

1.     The CarePoint Hospitals are local, hospital-based, emergency medical care providers.  The CarePoint Hospitals are essential "safety net" hospitals which provide critical acute healthcare to a significant uninsured and underinsured population in Hudson County, New Jersey.

2.     Since receiving approval from the State of New Jersey earlier this year to transfer their ownership from a for-profit ownership structure to a non-profit ownership structure, the CarePoint Hospitals have operated entirely on a non-profit basis under the ultimate ownership of CarePoint Health Systems, Inc. ("CarePoint Health"), a New Jersey non-profit corporation.

3.      The vast majority of the CarePoint Hospitals' patients seek treatment through these hospitals' emergency departments.  Like all hospitals, the CarePoint Hospitals are prohibited by federal and state law from turning away any individual in need of emergent or urgent medical treatment because of inability to pay or unavailability of insurance.  Thus, the CarePoint Hospitals are required by law to provide emergency and urgent care to any patient, regardless of the patient's ability to pay, and regardless of source of insurance payment.

4.      Because the CarePoint Hospitals treat a disproportionate share of uninsured and underinsured patients by virtue of their status as safety-net hospitals, whom they have no discretion to turn away, the CarePoint Hospitals depend on commercial insurance carriers such as Cigna to pay these hospitals properly for the care – particularly the emergency care – provided to patients covered by plans or policies of health insurance that these private carriers directly insure or administer. Proper payment by these commercial insurers is essential for the CarePoint Hospitals to continue to operate and provide essential patient care within Hudson County at the highest level.

5.      Importantly, the American Heart Association has certified each of the CarePoint Hospitals as Primary Stroke Centers.  Commencing in September 2022, Christ Hospital was certified as Hudson County's only Thrombectomy-Capable

Stroke Center.  All of the CarePoint Hospitals have also received an accreditation from the New Jersey Department of Health Care Quality Assessment.

6.     The CarePoint Hospitals are also recipients of numerous honors and awards.  For example, they have earned The Joint Commission's Gold Seal of Approval for Hospital Accreditation, along with ranking first in the Country for equitable care by the prestigious Lown Institute.  The CarePoint Hospitals have also won numerous awards for patient safety.

7.     Unfortunately, however, the CarePoint Hospitals face significant financial challenges and cash flow issues due to their status as safety net hospitals and paltry reimbursements from private insurance carriers for claims covered by private insurance.

8.     Cigna is one such private insurance carrier that has contributed to the CarePoint Hospitals' financial challenges through a pattern of underpaying the hospitals on valid claims.  Cigna provides health care insurance, administration, and/or benefits to insureds or plan participants pursuant to a variety of health care benefit plans and policies of insurance, including employer-sponsored benefit plans and individual health benefit plans ("Cigna Plans" or "Plans").

9.     Many of the Cigna Plans are employee benefit plans governed by the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq*.

Others are individual health insurance plans or public employer plans not subject to ERISA and governed by state law.

10.     At issue in this litigation is Cigna's intentional and unlawful pattern of underpaying the CarePoint Hospitals, which were out-of-network with Defendants before June 1, 2021, for claims submitted to Defendants for medical treatment provided to patients covered by the Plans provided or administered by Defendants ("Defendants' Subscribers" or "Cigna Subscribers").

11.     Specifically, during the period from March 15, 2016, through May 31, 2021 ("the Claim Period"), Cigna failed to pay the CarePoint Hospitals the amounts the Cigna Plans required for at least 4,708 claims for reimbursement for treatment that the CarePoint Hospitals provided to the Cigna Subscribers ("the Underpaid Claims"), as follows:

a.     Cigna underpaid BMC by a total of $32,033,238.82 during the Claim Period, comprising underpayments of $30,025,360.34 for 1,120 claims for emergency services; and another $2,007,878.48 in underpayments for 103 claims for non-emergency services;

b.     Cigna underpaid Christ Hospital by a total of $37,879,251.42 during the Claim Period, comprising underpayments of $32,824,168.79 for 1,420 claims for emergency services; and another $5,055,082.63 in underpayments for 171 claims for non-emergency services;

    c.    Cigna underpaid HUMC by a total of $44,728,465.03 during the Claim Period, comprising underpayments of $35,114,856.73 for 1,692 claims for emergency services; and another $9,613,608.30 in underpayments for 202 claims for non-emergency services.

12.    As detailed below, Cigna paid each of the Underpaid Claims in amounts well below what the Cigna Plans required.  Accordingly, Plaintiffs, as assignees of the Cigna Subscribers, bring this action under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq*., and state law, based on Defendants' failure to pay the CarePoint Hospitals the amounts they are due under the Cigna Plans.

13.    Additionally, as detailed below, Cigna processed many of the Underpaid Claims using its so-called "cost-containment" program by which it paid itself and its third-party business partners "fees" based on a percentage of the so-called "savings" Cigna achieved on specific Underpaid Claims – with the "savings" calculated based on the amounts by which Cigna underpaid the claims at issue.  In doing so, Cigna violated its ERISA fiduciary duties to avoid self-dealing and financial arrangements that benefitted Cigna and its third-party beneficiaries at the expense of its beneficiaries, in violation of 29 U.S.C. §§ 1104(a)(1)(A) and 1106(a)(1)(D) and (b)(1)).

14.     Accordingly, the CarePoint Hospitals bring this action to seek redress for Cigna's failure to pay the amounts due to the CarePoint Hospitals under the Cigna Plans, in violation of ERISA and state law; and for Cigna's failure to honor its independent ERISA fiduciary obligations to the CarePoint Hospitals.

## THE PARTIES

15.     BMC is a limited liability company, organized under the laws of the State of New Jersey, with its principal place of business at 29th Street and Avenue E, Bayonne, New Jersey 07002.

16.     Christ Hospital is a limited liability company, organized under the laws of the State of New Jersey, with its principal place of business at 176 Palisade Avenue, Jersey City, New Jersey 07306.

17.     HUMC is a limited liability company, organized under the laws of the State of New Jersey, with its principal place of business at 308 Willow Avenue, Hoboken, New Jersey 07030.

18.     Cigna Health is a corporation organized under the laws of the State of Connecticut, with its principal place of business at 900 Cottage Grove Road, Bloomfield, Connecticut 06002.

19.     Cigna Health is in the business of underwriting, selling, and administering health benefit plans and policies of health insurance.  Cigna Health

provides benefits under a variety of health benefit plans, including individual health benefit plans and group plans, including employer-sponsored plans.

20.     Connecticut General is a corporation organized under the laws of the State of Connecticut, with its principal place of business at 900 Cottage Grove Road, Bloomfield, Connecticut 06002.

21.     Connecticut General is in the business of underwriting, selling, and administering health benefit plans and policies of health insurance.  Connecticut General provides benefits under a variety of health benefit plans, including individual health benefit plans and group plans, including employer-sponsored plans.

## JURISDICTION AND VENUE

22.     This Court has federal question subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331, as the CarePoint Hospitals assert federal claims against Defendants, in Counts One and Two under ERISA.

23.     This Court also has supplemental jurisdiction over the CarePoint Hospitals' state law claims against Defendants, in Counts Three through Six, because these claims are so related to the CarePoint Hospitals' federal claims that the state law claims form a part of the same case or controversy under Article III of the United States Constitution.  The Court has supplemental jurisdiction over these claims pursuant to 28 U.S.C. § 1367(a).

24.     This Court has personal jurisdiction over Cigna because Cigna carries on one or more businesses or business ventures in this judicial district; there is the requisite nexus between the business(es) and this action; and Cigna engages in substantial and not isolated activity within this judicial district.

25.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2), because a substantial portion of the events giving rise to this action arose in this District.

## FACTUAL ALLEGATIONS

### A.     The CarePoint Hospitals

26.     BMC is a 244-bed, fully accredited, acute care hospital that provides quality, comprehensive, community-based health care services to more than 70,000 people annually.   The hospital includes comprehensive inpatient and outpatient programs in such areas as: cardiology, medical and radiation oncology, emergency services, diagnostic laboratory, radiology, surgery, senior services, psychiatric and more. The facilities include 205 medical/surgical beds, 10 obstetrical beds, 14 adult ICU/CCU beds, and 15 adult, acute open psychiatric beds. The Emergency Department includes 23 full-service emergency room bays.   The service complement consists of 6 inpatient operating rooms, 2 cystoscopy rooms,  full-service cardiac catheterization lab, full-service vascular lab, Vein Institute, Acute Dialysis service, 1 MRI unit, emergency angioplasty services, elective angioplasty, 2 hyperbaric

chamber units, Linear Accelerator and a PET-CT diagnostic imaging unit.  BMC is affiliated by common ownership with Christ Hospital and HUMC and is currently operated on a non-profit basis under its ultimate parent corporation, CarePoint Health.

27.    Christ Hospital is a 349-bed fully accredited acute care hospital.  With a highly-qualified medical team — including more than 500 doctors with specialties ranging from allergies to vascular surgery — Christ Hospital offers a full spectrum of services and has been recognized for excellence in cardiovascular, neuroscience, respiratory, and medical/surgical care.  As a state-certified and Joint Commission Accredited Stroke Center and Primary Angioplasty Center, Christ Hospital provides lifesaving emergency interventions with outcomes that rank among the best in New Jersey.  Christ Hospital was recently ranked as #1 for equitable care in the country by the prestigious Lown Institute. Christ Hospital is also affiliated by common ownership with BMC and HUMC and is also currently operated on a non-profit basis under its ultimate parent corporation, CarePoint Health.

28.    HUMC is a 348-bed fully accredited general acute care hospital. HUMC provides advanced medical technologies in support of its medical staff, nursing team, and other caregivers, to enable state-of-the-art care to citizens of Hoboken and the surrounding communities.  HUMC offers excellence in emergency medicine in the 34-bay emergency room and the dedicated OB/GYN ED; inpatient

rehabilitation; transitional care; child and adult behavioral health; women's care; wound care; and numerous surgical subspecialties.  The American Heart and Stroke Association awarded the Silver Award to HUMC for its dedication to improving quality of care for stroke patients.  Overall, HUMC was ranked in the top ten hospitals in New Jersey for care quality among all hospitals in the state with 350 beds or fewer.  HUMC is also affiliated by common ownership with BMC and Christ Hospital and is also currently operated on a non-profit basis under its ultimate parent corporation, CarePoint Health.

29.     Between 2008 and 2012, each of the CarePoint Hospitals was purchased out of bankruptcy.  The owners then invested substantial time, effort and capital into improving the hospitals' finances, physical plant, equipment, and overall quality of the healthcare services they provide.  Setting aside the immeasurable benefit of improved health care for the patient communities, the new owners' efforts to rescue these hospitals from bankruptcy have generated huge economic benefits to Hudson County and the State of New Jersey.

30.     During the Claim Period, the CarePoint Hospitals, as safety net hospitals, were paid far less than their costs for services provided to Medicare, Medicaid and Charity Care patients.

31.     During the Claim Period, the CarePoint Hospitals, as safety net hospitals, continued to rank very high in the State of New Jersey in charity care as a

percentage of total care provided.  This data also reflected that the CarePoint Health System was the largest Charity Care provider in Hudson County.

32.     The CarePoint Hospitals, like all hospitals, are prohibited by the Emergency Medical Treatment and Active Labor Act of 1986 ("EMTALA"), 42 U.S.C. § 1395dd, and applicable state law, from turning away women who are in active labor or any other persons in need of emergent/urgent medical treatment because of inability to pay or unavailability of insurance.

33.     Thus, the CarePoint Hospitals and the independent physicians attending to patients at the hospitals are required by law to provide emergency/urgent care to any patient regardless of the patient's ability to pay and regardless of source of insurance payment.  A patient's ability to pay has never affected or impeded the CarePoint Hospitals' delivery of emergency health care.

**B.     The CarePoint Hospitals' Out-of-Network Status Through May 31, 2021**

34.     Health care providers are either "in-network" or "out-of-network" with respect to insurance carriers.  "In-network" or "participating" providers are those who contract with health insurers that require them to accept discounted negotiated rates as payment in full for covered services.

35.     "Out-of-network" or "non-participating" providers are those that do not have contracts with insurance carriers to accept negotiated rates and instead,

- 12 -

independently set their own fees for the health care services and supplies they deliver to their patients.

36.    New Jersey law does not specify how a hospital's out-of-network charges must be determined.  Rather, under New Jersey law, hospitals are permitted to set charges for various services and products as they see fit.  *N.J.S.A.* 26:2H-18.51. Moreover, courts lack authority to review and adjust a hospital's set charges under New Jersey law.  *DiCarlo v. St. Mary Hospital*, 530 F.3d 255 (3d Cir. 2008); *Matter of Final Agency Decision by New Jersey Dep't of Health Regarding Utilization and Quality Review for Calendar Year 1993*, 273 N.J. Super. 205, 226 (App. Div. 1994).

37.    Notably, all three of the CarePoint Hospitals were previously forced to seek bankruptcy protection because of inadequate in-network arrangements.  BMC, HUMC, and Christ Hospital were purchased out of bankruptcy by their then owners in 2008, 2011 and 2012, respectively.

38.    After being purchased out of bankruptcy, each of the CarePoint Hospitals was an out-of-network provider with Cigna until June 1, 2021, when the CarePoint Hospitals entered into three separate Hospital Agreements and became in-network with Cigna.

### C.    The CarePoint Hospitals' Out-of-Network Status Was Well Known to Patients and the Public

39.    During the Claim Period, the CarePoint Hospitals prominently advised their patients and the public of their out-of-network status.  The hospitals' websites

- 13 -

directed, and continue to direct, patients to a webpage that lists the insurers with whom the hospitals are in-network and explains the difference between in-network and out-of-network providers, and how the hospitals bill insurers and patients.

40.    The CarePoint Hospitals' Insurance Help Desks were, at all relevant times during the Claim Period, and remain, available to answer questions from patients.  In addition, their billing department was, and is, available to explain and review a patient's bill, and discuss payment options**.**

41.    The CarePoint Hospitals also directed, and continue to direct, patients to contact their carrier to understand their out-of-network benefits.

**D.    During the Claim Period, Cigna Subscribers Sought and Received Emergency Medical Treatment from the CarePoint Hospitals**

41.    As noted above, Plaintiffs were out-of-network with Cigna during the Claim Period.

42.    Notwithstanding the CarePoint Hospitals' out-of-network status with respect to Cigna during the Claim Period, Cigna Subscribers received treatment from the CarePoint Hospitals' emergency departments.

43.    Importantly, federal and New Jersey law obligate Plaintiffs, as emergency medical providers, to provide treatment to all patients who present at emergency departments. 42 U.S.C. § 1395dd; *N.J.S.A.* 26:2H-18.64.

44.    Among other things, EMTALA, and similar provisions of New Jersey laws and regulations, mandate that hospitals and the physicians that staff hospital

- 14 -

emergency departments have a duty to provide an appropriate medical screening examination to all individuals who come to an emergency department with what they believe to be an emergent or urgent condition. 42 U.S.C. § 1395dd(a); *N.J.S.A.* 26:2H-18.64; *N.J.A.C.* 8:43G-12.7(c).

45.     If it is determined that an emergency medical condition exists, the patient must be evaluated by a physician and, with certain limited exceptions, provided such medical treatment as is necessary to assure that the condition has been stabilized. 42 U.S.C. § 1395dd(b), (c); *N.J.A.C.* 8:43G-12.7(d), (e).

46.     If it is determined that an emergency does not exist, the patient shall either be treated in the emergency department or referred to an appropriate health care provider, and be given appropriate discharge instructions. *N.J.A.C.* 8:43G-12.7(f), (n).

47.     New Jersey regulations make clear that no patient who comes to a hospital emergency department shall be discharged to home or another facility without being seen and evaluated by qualified medical personnel, which must occur within four hours of the patient's coming to the emergency department. *N.J.A.C.* 8:43G-12.7(g).

48.     EMTALA and New Jersey law subject emergency department physicians to civil liability for violations.  For example, "any physician who is responsible for the examination, treatment, or transfer of an individual in a

participating hospital" who negligently violates EMTALA is subject to civil monetary penalties of up to $50,000 per violation. 42 U.S.C. §1395dd(d)(1)(B).

49.     There are no exceptions to the emergency medicine providers' legal obligation to render services based on a patient's ability to pay or the presence of health insurance.   Notably, *N.J.S.A.* 26:2H-18.64 provides that "[n]o hospital shall deny any admission or appropriate services to a patient on the basis of that patient's ability to pay or source of payment."  A patient's ability to pay in no way affects or impedes the delivery of emergency care by Plaintiffs.

**E.     With Plaintiffs' Duty to Treat Cigna Subscribers Comes Cigna's Concomitant Duty to Pay Plaintiffs a Reasonable Rate for Out-of-Network Emergency Services**

50.     Because emergency medical providers have no discretion to turn patients away, and must treat all patients, regardless of ability to pay, they depend on commercial insurance companies to meet their legal responsibility and timely and properly pay a reasonable rate, and no less than the amounts due under the health insurance plans they insure and administer, to providers such as Plaintiffs who are not "in-network" and are not "participating" providers.

51.     The duty of healthcare insurers to pay a reasonable rate to out-of-network providers for the treatment they are required to provide to those insurers' subscribers derives not only from principles of fundamental fairness and equity, but also from multiple sources of federal and state law.

- 16 -

## 1.      Federal Coverage and Payment Mandates

52.      The Patient Protection and Affordable Care Act ("ACA") added
Section 2719A to the Public Health Services Act ("PHS Act"), 42 U.S.C. § 300gg-
19a.  Section 2719A requires any group health plan, or health insurer that provides
or covers benefits with respect to services in an emergency department of a hospital,
to cover any emergency services:  without the need for prior authorization; without
regard to the provider's status as an in-network or out-of-network provider; and in a
manner that ensures that the patient's cost-sharing requirement (expressed as a
copayment amount or coinsurance rate) is the same requirement that would apply if
such services were provided in-network.  42 U.S.C. § 300gg-19a(b)(1).  These cost-
sharing requirements are expressly incorporated into group health plans covered by
ERISA.  *See* 29 U.S.C. § 1185d(a) (certain provisions of the PHS Act, including
Section 2719A, "shall apply to group health plans, and health insurance issuers
providing health insurance coverage in connection with group health plans, as if
included in this subpart").

53.      For out-of-network emergent claims, Cigna must ensure that it pays at
least the greatest of three amounts specified in Regulations promulgated pursuant to
Section 2719A.  29 C.F.R. § 2590.715- 2719A(b)(3)(i)(A)-(C).

54.      These regulations provide that, to satisfy the ACA's cost-sharing
obligations, a non-grandfathered plan must pay the greatest of three possible

- 17 -

amounts for out-of-network emergency services:  (1) the amount negotiated with in-network providers for the emergency service, accounting for in-network co-payment and co-insurance obligations; (2) the amount for the emergency service calculated using the same method the plan generally uses to determine payments for out-of-network services (such as usual, customary and reasonable charges), but excluding any in-network co-payment and co-insurance imposed, and "without reduction for out-of-network cost sharing that generally applies under the plan or health insurance coverage with respect to out-of-network services"; or (3) the amount that would be paid under Medicare for the emergency service, accounting for in-network co-payment and co-insurance obligations.  29 C.F.R. § 2590.715-2719A(b)(3)(i)(A)-(C) (the "Greatest of Three regulation").[1]

55.    The Greatest of Three regulation permits balance billing of the providers' charges that exceed the allowable amount as long as there is no state prohibition on balance billing.  29 C.F.R. § 2590.715-2719A(b)(3)(i).

56.    The Greatest of Three regulation also expressly provides that any out-

---

[1] The "Greatest of Three" provision of the ACA was effectively superseded by provisions of the "No Surprises Act," which went into effect on January 1, 2022. (No Surprises Act, H.R. 3630, 116th Cong. (2019)).  "The No Surprises Act" amended section 2719A of the PHS Act to include a sunset provision effective for plan years beginning on or after January 1, 2022, when the new protections under the No Surprises Act took effect. See interim final regulations titled "Requirements Related to Surprise Billing; Part I."  (86 FR 36872, July 13, 2021).

of-pocket maximums that apply generally to out-of-network benefits must apply equally to out-of-network emergency services.   29 C.F.R. § 2590.715-2719A(b)(3)(ii).[2]

## 2.   New Jersey's Prompt Payment Requirements

57.   Cigna is also governed by the prompt payment requirements of the New Jersey Health Claims Authorization, Processing and Payment Act ("HCAPPA").

58.   HCAPPA's requirements are codified in various sections of the New Jersey Statutes, including, as applicable to Cigna, *N.J.S.A.* 17B:26-9.1 (applicable to health insurance other than group and blanket insurance), *N.J.S.A.* 17B:27-44.2 (applicable to group health and blanket insurance), and *N.J.S.A.* 26:2J-8.1(d)(9) (applicable to health maintenance organizations).   Regardless of the nature of the payor and type of insurance, however, HCAPPA's prompt payment requirements are the same.

59.   Under HCAPPA, the insurance carrier must acknowledge receipt of all claims, both emergent and non-emergent, within two working days. *See N.J.S.A.* 17B:26-9.1(d)(5); *N.J.S.A.* 17B:27-44.2(d)(5) and *N.J.S.A.* 26:2J-8.1(d)(5).

60.   HCAPPA further requires insurance carriers to pay claims within 30

---

[2] Out-of-pocket maximums are annual limitations on the amount a patient covered by a plan may be required to spend on covered health care costs.  Once the annual out-of-pocket maximum is reached, the plan must pay 100% of all covered expenses for that person.

days after the insurance carrier receives the claim when submitted electronically, or

40 days if received non- electronically, provided the following conditions apply:

a.    the healthcare provider is eligible at the date of service;

b.    the person who receives the healthcare service is covered on the date of service;

c.    the claim is for a service or supply covered under the health benefits plan;

d.    the claim is submitted with all the information requested by the payer on the claim form or in other instructions that is distributed in advance to the healthcare provider or covered person in accordance with the provisions of section 4 of P.L.2005, c. 352 (C.17B:30-51); and

e.    the payer has no reason to believe that the claim has been submitted fraudulently.

*N.J.S.A.* 17B:26-9.1(d)(1), 17B:27-44.2(d)(1) and *N.J.S.A.* 26:2J-8.1(d)(1).

61.    In addition, HCAPPA requires that, if all or a portion of the claim is not paid within the statutory timeframe for one or more statutorily enumerated reasons, the payer shall notify the health care provider and covered person in writing within 30 days of receipt of an electronic claim, or within 40 days of receipt of a claim submitted by other than electronic means, that: (i) the claim is incomplete with a statement as to what substantiating documentation is required for adjudication of the claim; (ii) the claim contains incorrect information with a statement as to what information must be corrected for the adjudication of the claim; (iii) the payer disputes the amount claimed in whole or in part with a statement as to the basis of

that dispute; or (iv) the payer finds there is strong evidence of fraud and has initiated an investigation into the suspected fraud in accordance with its fraud prevention plan or referred the claim, together with supporting documentation, to the Office of the Insurance Fraud Prosecutor. *N.J.S.A.* 17B:26-9.1(d)(2); *N.J.S.A.* 17B:27-44.2(d)(2).

62.     Moreover, under HCAPPA, an insurance carrier's dispute of a portion of the claim does not excuse the carrier from payment of the entire claim: "Any portion of a claim that meets the criteria established in paragraph (1) of this subsection shall be paid by the payer in accordance with the time limit established in paragraph (1) of this subsection." *N.J.S.A.* 17B:26-9.1(d)(4), *N.J.S.A.* 17B:27-44.2(d)(4) and *N.J.S.A.* 26:2J-8.1(d)(4).

63.     The New Jersey Out-of-Network Consumer Protection, Transparency, Cost Containment and Accountability Act ("OON Act"), codified at *N.J.S.A.* 26:2SS-1 to -20, modified HCAPPA's prompt payment requirements for inadvertent or emergency claims upon taking effect on August 30, 2018.  The OON Act applies to all health insurance plans in New Jersey other than self-funded plans governed by ERISA that have not opted into the law's coverage.

64.     Specifically, under the OON Act, for inadvertent or emergency out-of-network payments, the insurer must make a determination within 20 days from the date of receipt of a claim for services whether it considers the claim to be excessive. *N.J.S.A.* 26:2SS-9(c).  If not, the insurer must promptly pay the claim.  If the insurer

considers the claim to be excessive, it must notify the provider of this determination within 20 days of receipt of the claim. If the insurer provides this notification, the insurer and the provider have 30 days from the date of notification to negotiate a settlement.  The insurer may attempt to negotiate a final reimbursement amount with the out-of-network healthcare provider, which differs from the amount paid by the insurer pursuant to the requirements under *N.J.S.A.* 26:2SS-9.

65.    If no settlement is reached after 30 days, the insurer must pay the provider the insurer's final offer for the services.  If the insurer and provider cannot agree on the final offer as a reimbursement rate for these services, the insurer, provider, or patient beneficiary, as applicable, may initiate binding arbitration within 30 days of the final offer, pursuant to *N.J.S.A.* 26:2SS-10.

66.    Binding arbitration under the OON Act is permissive, not mandatory, for claims subject to the OON Act. *N.J.S.A.* 26:2SS-7 ("If a covered person receives medically necessary services at an out-of-network health care facility on an emergency or urgent basis as defined by [EMTALA and *N.J.S.A.* 26:2H-18.64)], and the carrier and facility cannot agree on the final offer as a reimbursement rate for these services pursuant to section 9 of this act, the carrier, health care facility, or covered person, as applicable, *may* initiate binding arbitration pursuant to section 10 or 11 of this act") (emphasis added).

67.    New Jersey provides interest as a penalty against insurers such as Cigna

- 22 -

for overdue payments in the amount of 12% per annum, *N.J.S.A.* 17B:26-9.1(d)(9),

*N.J.S.A.* 17B:27-44.2(d)(9) and *N.J.S.A.* 26:2J-8.1(d)(9), except during the pendency

of arbitration under the OON Act, to the extent that the OON Act applies, *see*

*N.J.S.A.* 26:2SS-10(c)(2).  The interest must be paid to the healthcare provider at the

time the overdue payment is made.  *N.J.S.A.* 17B:27- 44.2(d)(9) and *N.J.S.A.* 26:2J-

8.1(d)(9).

### F.    Federal Reimbursement Requirements for Emergency Out-of-Network Services

68.     With respect to out-of-network services in an emergency department of

a hospital, by operation of law, as discussed above, throughout the Claim Period, the

Cigna Plans governed by ERISA incorporated the requirements of the ACA and

mandate coverage of any emergency services:   without the need for prior

authorization; without regard to the provider's status as an in-network or out-of-

network provider; and in a manner that ensures that the patient's cost-sharing

requirement (expressed as a copayment amount or coinsurance rate) is the same

requirement that would apply if such services were provided in-network.  *See* 42

U.S.C. § 300gg-19a(b)(1); 29 U.S.C. § 1185d(a).

69.     Thus, for emergency or urgent care that the CarePoint Hospitals

provided to Defendants' Subscribers throughout the Claim Period, all of the Plans

require Defendants to pay the CarePoint Hospitals the greatest of the three amounts

set forth in the Greatest of Three regulation discussed above.   Typically, this will

require that the Plans reimburse the CarePoint Hospitals, at a minimum, the amount calculated using the same methodology the Plans generally use to determine payments for out-of-network services, but excluding any in-network co-payment and co-insurance imposed, and "without reduction for out-of-network cost sharing that generally applies under the plan or health insurance coverage with respect to out-of-network services."  29 C.F.R. § 2590.715- 2719A(b)(3)(i)(B).

70.    Moreover, by operation of law, if an out-of-pocket maximum generally applies to out-of-network benefits, that out-of-pocket maximum must apply to out-of-network emergency services.  29 C.F.R. § 2590.715-2719A(b)(3)(ii).

## G.    Reimbursement Requirements under the Cigna Plans

71.    The Cigna Plans require Cigna, as the Plans' insurer and/or administrator, to reimburse out-of-network hospitals for covered expenses calculated at the rates specified in the Plans.

72.    In the course of discovery and their investigation in this case, Plaintiffs have obtained copies of summary plan descriptions ("SPDs") for at least 114 plans covering 1,149 of the Underpaid Claims at issue in this case.  Annexed hereto as Exhibit A is a table identifying the plans at issue by name (and numbered "Plan 1" through "Plan 114" for litigation purposes) and containing additional pertinent

information about how the Plans require Cigna to calculate reimbursements under the Plans.[3]  This information includes, where available:

a.     the Plans' "Maximum Reimbursable Charge" ("MRC") or "Reasonable and Customary ("R&C") language, setting forth the total amounts from which Cigna's reimbursements are to be calculated (for Plans that use MRC language, the language has two basic formulations, "MRC-1" and "MRC-2", described more fully in the next section);

b.     the Plans' cost-share percentages for emergency and non-emergency services, setting forth the percentages of the MRC or R&C amounts that the Plans require Cigna to pay for either emergency or elective services, after applying any deductibles or copayments (the balance of the cost-share percentage that Cigna is not required to pay is known as "co-insurance");

c.     the Plans' deductibles and any co-payments applicable to emergency and non-emergency services, specifying amounts in addition to co-insurance that Cigna Subscribers are expected to pay with respect to a particular service; and

---

[3] Because Exhibit A is derived from the Cigna Plans, which Cigna has designated "Confidential" under the Discovery Confidentiality Order in this case, Exhibit A is being filed under seal.

d.      the Plans' out-of-pocket maximums, specifying the maximum amounts (in co-insurance, deductibles, and co-payments) that the Cigna Subscriber is required to pay on a claim before Cigna reimburses the claim at 100% of the applicable "MRC" or "R&C" amount.

73.      Upon information and belief – based, inter alia, on the language of the Cigna Plans identified on Exhibit A; Cigna's representations in discovery; and public statements on its website – the Cigna Plans not listed on Exhibit A likewise require Cigna to calculate reimbursement based on one of three formulas (MRC-1, MRC-2, and R&C), and subject to applicable co-insurance, deductibles, co-payments, and out-of-pocket maximums.

74.      Exemplar SPDs for Plans 12, 54, 61, 81, and 108, described on Exhibit A, and produced by Cigna in discovery in this case to date, are annexed hereto as Exhibits B-F. [4]  As detailed on these exhibits, by way of example:

a.      Plan 12 calculates out-of-network reimbursement for emergency claims at 70% of the R&C amount, with a $2,500 deductible and a $6,350 out-of-pocket maximum (Exhibit B at 14, 16, 40-41).

---

[4] Again, because Cigna designated Exhibits B-F as "Confidential" under the Discovery Confidentiality Order in this case, Exhibits B-F are being filed under seal. To avoid burdening the Court, Plaintiffs are not attaching the remainder of the Cigna Plans listed on Exhibit A, but will make any or all of them available to the Court and Cigna on request.

b.      Plan 54 calculates out-of-network reimbursement for emergency claims at 90% of the MRC-2 amount, with a $1,500 deductible and a $6,000 out-of-pocket maximum (Exhibit C at 14, 17, 66).

c.      Plan 61 calculates out-of-network reimbursement for emergency claims at 100% of the MRC-1 amount, with a $150 co-payment (which is waived if the patient is admitted to the hospital), and a $7,000 out-of-pocket maximum (Exhibit D at 14, 16, 56).

d.      Plan 81 calculates out-of-network reimbursement for emergency claims at 100% of the MRC-2 amount, with a $400 deductible and a $1,000 out-of-pocket maximum (Exhibit E at 19, 20, 77-78).

e.      Plan 108 calculates out-of-network reimbursement for emergency claims at 90% of the MRC-1 amount for emergency claims, with a $700 deductible and a $3,000 out-of-pocket maximum (Exhibit F at 13, 14, 16, 55).

**H.      The Plans' MRC-1, MRC-2, and R&C Methodologies**

75.     As discussed above, the total amounts from which Cigna is required to calculate reimbursements derive from one of three primary methodologies specified in the Cigna Plans –MRC-1, MRC-2, or R&C.

**1.      MRC-1**

76.     For plans that adopt the "MRC-1" method, the Plans define MRC substantially as follows:

Maximum Reimbursable Charge – Medical

The Maximum Reimbursable Charge for covered services is determined based on the lesser of:

• the provider's normal charge for a similar service or supply;

or

• a policyholder-selected percentile of charges made by providers of such service or supply in the geographic area where it is received as compiled in a database selected by Cigna.

The percentile used to determine the Maximum Reimbursable Charge is listed in The Schedule.

The Maximum Reimbursable Charge is subject to all other benefit limitations and applicable coding and payment methodologies determined by Cigna. Additional information about how Cigna determines the Maximum Reimbursable Charge is available upon request.

See Exhibit A (entries for Plans 2, 10, 11, 13, 14, 22, 23, 29, 30, 31, 35, 37, 39, 42, 43, 47, 49, 53, 61, 62, 69, 72, 78, 80, 82, 83, 84, 86, 103, 105, 106, 108, and 109); see also Exhibit D at 56; Exhibit F at 55.

77.    Upon information and belief, the "database selected by" Cigna for purposes of the MRC-1 methodology is the "FAIR Health" database, a database administered by the independent not-for-profit entity, "FAIR Health, Inc." (which stands for "Fair and Independent Research").[5]

---

[5]The language for Plans 5, 17, 18, and 26 use modified language in their formulation of the MRC-1 amount, but like the other MRC-1 plans, they point to an external

- 28 -

78.     FAIR Health, Inc. was established in 2009 out of settlement of claims brought by the New York State Attorney General alleging that multiple health insurers, including Cigna, had been relying on a database known as "Ingenix," which the New York Attorney General described as a "fraudulent and conflict-of-interest ridden reimbursement system affecting millions of patients and their families and costing Americans hundreds of millions of dollars in unexpected and unjust medical costs."   The FAIR Health database uses information from more than 43 billion claims to estimate what health care providers charge, and what insurers pay, for providing healthcare to patients."[6]

79.     The "policyholder selected percentile" within the MRC-1 definition is the percentile of the FAIR Health database that the Plan sponsor has selected.  Upon information and belief, most of the Cigna Plans identified on Exhibit A that use the MRC-1 definition have selected the 80th percentile of FAIR Health as the basis upon

---

standard based on charges of other providers in the same or similar geographic area. See Exhibit A, entry for Plan 5 ("we base the Plan allowance on the lesser of the provider's actual charge or the allowed amount for the service you received. We determine the allowed amount by using health care charges guides which compare charges of other providers for similar services in the same geographical area."); entries for Plans 17 and 18 ("For this program, the MRC is 90th percentile of all charges made by providers of such service or supply in the geographic area."); entry for Plan 26 ("Cigna HealthCare determines these amounts by computing what area physicians charge for specific services.").  Upon information and belief, this external standard is likewise based on the FAIR Health database.

[6] FAIR Health Consumer, "About FAIR Health," accessed at https://www.fairhealthconsumer.org/#about (last visited November 29, 2023).

which the MRC-1 rate is calculated.  The exceptions are Plans 17 and 18, which have selected the 90th percentile of the FAIR Health database.

80.    Thus, for the Cigna Plans that follow the MRC-1 methodology, Cigna must calculate the required reimbursement based on the lesser of the CarePoint Hospitals' normal charges or the 80th (or 90th) percentiles of the FAIR Health database.

### 2.    MRC-2

81.    For plans that adopt the "MRC-2" method, the Plans define MRC substantially as follows:

Maximum Reimbursable Charge – Medical

The Maximum Reimbursable Charge for covered services is determined based on the lesser of:

• the provider's normal charge for a similar service or supply;

or

• a policyholder-selected percentage of a schedule developed by Cigna that is based upon a methodology similar to a methodology utilized by Medicare to determine the allowable fee for the same or similar service within the geographic market.

The percentage used to determine the Maximum Reimbursable Charge is listed in The Schedule.

In some cases, a Medicare based schedule will not be used and the Maximum Reimbursable Charge for covered services is determined based on the lesser of:

• the provider's normal charge for a similar service or supply;

or

• the 80th percentile of charges made by providers of such service or supply in the geographic area where it is received as compiled in a database selected by Cigna.

The Maximum Reimbursable Charge is subject to all other benefit limitations and applicable coding and payment methodologies determined by Cigna. Additional information about how Cigna determines the Maximum Reimbursable Charge is available upon request.

See Exhibit A (entries for Plans 1, 3, 4, 6, 7, 15, 16, 19, 20, 21, 24, 25, 27, 28, 32, 33, 34, 36, 38, 40, 41, 44, 45, 46, 48, 50, 51, 52, 54, 55, 56, 60, 63, 64, 65, 66, 67, 70, 73, 74, 75, 76, 79, 81, 85, 87, 91, 93, 94, 95, 97, 98, 99,  100, 101, 102, 104, 107, 110, 111, 112, 113); see also Exhibit C at 66-67; 56; Exhibit E at 77-78.

82.     Upon information and belief, Cigna has never developed the "schedule" within the meaning of the MRC-2 definition based upon a "methodology similar to a methodology utilized by Medicare."   Instead, upon information and belief, it simply relies on a database into which it has inputted the traditional Medicare rates. In *Advanced Gynecology & Laparoscopy of North Jersey, P.C. v. Cigna Life & Health Ins. Co.*, No. 19-cv-22234-ES-MAH, Doc. No. 90 at 3, Cigna publicly acknowledged that, "[a]s to Cigna Plans using MRC2, Cigna advises that the "schedule" referenced in the MRC2 definition is not a single document that can be

produced in discovery, but rather consists of values contained in Cigna's claims systems."

83.     Accordingly, by operation of the MRC-2 language cited above, the MRC-2 amount defaults to the lesser of the provider's normal charges or "the 80th percentile of charges made by providers of such service or supply in the geographic area where it is received as compiled in a database selected by Cigna."[7]

84.     As noted above, the "database selected by Cigna" is the FAIR Health database.  Thus, for Plans that follow the MRC-2 methodology, MRC is calculated based on the lesser of the provider's normal charges or the 80th percentile of the FAIR Health database.

### 3.     R&C

85.     For plans that adopt the "R&C" methodology, the reimbursement language varies, but the R&C formulations also generally point to an external standard based on charges of other providers in the same or similar geographic area. See Exhibit A, entries for Plans 9 and 12 (defining R&C as "not more than the usual

---

[7]The language for Plans 77, 90, 92, and 114 employ somewhat different language in their MRC-2 definitions, but they all reference a schedule based on a "methodology similar to Medicare" or a "Medicare-based methodology," and they all default to an external standard based on charges of other providers in the same or similar geographic area in the absence of a Medicare-based schedule.  See Exhibit A (entries for Plans 77, 90, 92, and 114).  Again, as noted above, this external source is the FAIR Health database.

or customary charge for the service or supply as determined by Cigna, based on a standard which is most often charged for a given service by a Provider within the same geographic area"); Plan 12 (same);  Plans 57, 58, 59 (defining R&C based on "average claims data in your area and are determined by your health care company to be appropriate fees for medical services"); Plan 68 (defining R&C as "the lower of the provider's usual charge or what the Claims Administrator determines is the prevailing charge in the geographic area where this service or supply is furnished"); Plan 71 (stating that "R&C represents the range of usual fees for comparable services charged by the medical or dental professionals in a geographic area, as determined by the Health Plan Administrator."); Plans 88, 89 (defining R&C by reference to a "charge for a service that is not above the prevailing fee in the area for a comparable service or supply," with the health care carrier determining the range and area).[8]

---

[8] Two exceptions are for Plans 8 and 96.  Plan 8 bases its reimbursement methodology for out-of-network emergency services on the greater of "(i) the median amount negotiated with In-Network providers for the Emergency Service, excluding any In-Network copay or coinsurance; or (ii) the amount payable under the Medicare program, not to exceed the provider's billed charges."  Plan 96 bases its reimbursement methodology for out-of-network emergency services on the lesser of the provider's actual charges, a negotiated fee, or 500% of the Medicare allowable amount.  Upon information and belief, Plaintiffs' charges did not exceed these thresholds for either the two emergency claims covered by Plan 8 (identified as Claim #s 53 and 54 on the claim spreadsheet attached hereto as Exhibit G); or the one emergency claim covered by Plan 96 (identified as Claim # 994 on Exhibit G).

86.     As noted above, upon information and belief, the external standard that Cigna uses to calculate the charges of other providers in the same or similar geographic area is the FAIR Health database.

87.     Thus, as with plans that follow the MRC-1 and MRC-2 methodologies, for plans that adopt the R&C methodology, Cigna must calculate the R&C amount based on the FAIR Health database.

**I.     The CarePoint Hospitals Receive Complete Assignments of Benefits under Defendants' Plans for Treatment Provided to Defendants' Subscribers**

88.     During the Claim Period, each CarePoint Hospital was not under a contract with Cigna setting forth the terms under which Defendants would pay for services that the CarePoint Hospital provide to patients who are Cigna Subscribers.

89.     Rather, the CarePoint Hospitals acquired the right to reimbursement under the Cigna Plans through assignments they received from Cigna Subscribers.

90.     Specifically, upon registration at a CarePoint Hospital, all patients, including Defendants' Subscribers, execute a form titled "Assignment of Insurance Benefits/Direct Payment/Authorized Representative/Agent" (the "AOB Contract"), among other documents.  In the AOB Contracts, Defendants' Subscribers assign to the CarePoint Hospital their rights to benefits under Defendants' Plans.

91.     These AOB Contracts provide for the assignment to the CarePoint Hospital of all rights, benefits, and causes of action under Defendants' Plans:

I hereby assign to the Hospital, all of my rights, benefits, privileges, protections, claims, causes of action, interests or recovery, to any and all rights, benefits, privileges, protections, claims, causes of action, interests, or recovery of any type whatsoever receivable by me or on my behalf arising out of any policy of insurance, plan, trust, fund, or otherwise providing health care coverage of any type to me (or to any other third party responsible for me) for the charges for services rendered to me by the hospital.  This includes, without limitation, any private or group health/hospitalization plan, automobile liability, general liability, personal injury protection, medical payments, uninsured or underinsured motor vehicle benefits, settlements/ judgments/verdicts, self-funded plan, trust, workers compensation, MEWA, collective, or any other third-party payor providing health care coverage of any type to me (or to any other third party responsible for me) for the charges for services rendered to me by the hospital [collectively, "Coverage Source"].  **This is a direct assignment to the Hospital of any and all of my rights to receive benefits arising out of any Coverage Source**.  I understand that this assignment of benefits is irrevocable.  This assignment of benefits fully and completely encompasses any legal claim I may have against any Coverage Source, including, but not limited to, my rights to appeal any denial of benefits on my behalf, to request and obtain plan documents, to pursue legal action against any coverage source, and/or to file a complaint with the New Jersey Department of Banking and Insurance.

92.    The AOB Contracts also provide for payment of any benefits directly

to the CarePoint Hospital:

I authorize and direct payment be made by any and all coverage source directly to the hospital of all benefits, payments, monies, checks, funds, wire transfers or recovery of any kind whatsoever from any coverage source.  I also agree to assist the hospital in pursuing payment from any coverage source.  This includes, without limitation, signing documents requested or needed to pursue claims and appeals, getting documents from coverage source, or otherwise to support payment to the hospital.

93.     The AOB Contracts also provide for the CarePoint Hospital to act as the Defendants Subscriber/Patient's authorized agent and representative to pursue actions to recover benefits Defendants' Plans:

> I hereby authorize and designate the Hospital as my authorized agent and representative to act on my behalf with respect to all matters related to all of my rights, benefits, privileges, protections, claims, causes of action, interests or recovery arising out of any Coverage Source. This includes, without limitation, the Hospital requesting verification of coverage/pre-certification/authorization, filing pre-service and post-service claims and appeals, receiving all information, documentation, summary plan descriptions, bargaining agreements, trust agreements, contracts, and any instruments under which the plan is established or operated, as well as receiving any policies, procedures, rules, guidelines, protocols or other criteria considered by the coverage source, in connection with any claims, appeals, or notifications related to claims or appeals.

94.     These AOB Contracts provide, in part, that the patient is responsible for the payment of deductibles, copayments, coinsurance, and other charges not covered by the assignment:

> I understand that I am financially and legally responsible for charges not covered in full by the assignment of benefits …, including, but not limited to, any deductibles, copayments, and coinsurance amounts provided under any coverage source; and charges for which there is no Coverage Source.

95.     Upon information and belief, many of Defendants' Plans contain no anti-assignment provisions that would preclude subscribers from assigning their Plan benefits to the CarePoint Hospitals.

96.     Moreover, upon information and belief, many of Defendants' Plans

expressly permit the subscribers to assign Plan benefits to health care providers with Defendants' consent.

97.   Defendants have consented to the assignments, or otherwise waived the applicability of any anti-assignment clauses, through an extended course of dealing, described more fully below.  Among other things, when they decide to pay a claim, Defendants often remit payment directly to the CarePoint Hospitals, without reliance on any purported anti-assignment clauses, albeit in amounts grossly inadequate relative to Plaintiffs' actual charges.  Defendants also force Plaintiffs to pursue Defendants' internal appeals process, only to frustrate Plaintiffs once they are engaged in that process, but again, without citing to any purported anti-assignment clauses.  This and other conduct described more fully below amounts to Defendants' consent to its Subscribers' assignments of Plan benefits to the CarePoint Hospitals, or at a minimum, is an extended course of dealing that is inconsistent with any alleged anti-assignment clauses.

98.   Further, to the extent that any of the Plans have anti-assignment clauses, they are barred by New Jersey's Assignment of Benefits Law, which provides:

> With respect to a carrier which offers a managed care plan that provides for both in-network and out-of-network benefits, *in the event that the covered person assigns, through an assignment of benefits, his right to receive reimbursement for medically necessary health care services to an out-of-network health care provider, the carrier shall remit payment for the reimbursement directly to the health care provider* in the form of a check payable to the health care provider, or in the alternative, to the health care provider and the covered person as joint payees, with a

signature line for each of the payees.  Payment shall be made in accordance with the provisions of this section and [*N.J.S.A.* 17B:30-23 *et seq.*].  Any payment made only to the covered person rather than the health care provider under these circumstances shall be considered unpaid, and unless remitted to the health care provider within the time frames established by [*N.J.S.A.* 17B:30-23 *et seq.*], shall be considered overdue and subject to an interest charge as provided in that act.

*N.J.S.A.* 26:2S-6.1(c) (emphasis added).

### J.  Defendants Underpay the CarePoint Hospitals' Claims

#### 1.  For Each of the Underpaid Claims, the CarePoint Hospitals Provided Emergent and Elective Treatment to the Cigna Subscribers

99.  During the Claim Period, the CarePoint Hospitals, as out-of-network providers, rendered medical services in connection with the 4,708 Underpaid Claims as follows:

a.  At least 1,223 Underpaid Claims relate to hospital services provided by BMC during the Claim Period.  Of those claims: 1,120 were for emergency services; and 103 were for elective care within the scope of the out-of-network benefits provided under the Subscribers' Plans.

b.  At least 1,591 Underpaid Claims relate to hospital services provided by Christ Hospital during the Claim Period.  Of those claims: 1,420 were for emergency services; and 171 were for elective care within the scope of the out-of-network benefits provided under the Subscribers' Plans.

- 38 -

c.     At least 1,894 Underpaid Claims relate to hospital services provided by HUMC during the Claim Period.  Of those claims: 1,692 were for emergency services; and 202 were for elective care within the scope of the out-of-network benefits provided under the Subscribers' Plans.

### 2.     For Each of the Underpaid Claims, the CarePoint Hospitals Billed Cigna their Normal Charges

100.   The amounts that the CarePoint Hospitals billed Cigna for the Underpaid Claims are the CarePoint Hospitals' normal charges for each service or supply, as reflected on the CarePoint Hospitals' Chargemasters.

101.   A Chargemaster is an established list of all individual items and services maintained by a hospital for which the hospital has established a charge. At all relevant times, including throughout the Claim Period, each of the CarePoint Hospitals has maintained a Chargemaster containing a list, by Current Procedural Technology ("CPT") or Healthcare Common Procedure Coding Systems ("HCPCS") code, of the CarePoint Hospitals' standard charges for each service or supply.

102.   Since January 1, 2019, as required by Section 2718(e) of the Public Health Service Act and Section 1102(a) of the Social Security Act, the CarePoint Hospital Chargemasters are publicly available online at https://carepointhealth.org/patients-visitors/hospital-charges/ (last visited November 29, 2023).  As the CarePoint Hospitals make clear on their website, "[t]he

charges contained in our Chargemaster are the same for all patients, regardless of insurance company or coverage."

103.    For each of the Underpaid Claims, the CarePoint Hospitals billed Cigna using a standard claim form (entitled, the "UB-04" form).  The UB-04 form lists the CarePoint Hospitals' normal charges for each service or supply, as derived from the Chargemasters, for the inpatient and outpatient medically necessary emergent and elective services provided for each patient encounter with Cigna Subscribers.

104.    With each bill, the CarePoint Hospitals also submitted an itemized statement of the hospitals' normal charges for the services or supplies billed, as also derived from the Chargemasters.  The itemized statements inform Cigna of the specific services or supplies provided to the applicable Cigna Subscriber by the applicable CPT or HCPCS codes.

105.    Accordingly, Cigna was on notice of the CarePoint Hospitals' normal charges for every UB-04 and itemized statement submitted by the CarePoint Hospitals for each of the Underpaid Claims during the Claim Period.

### 3.    Cigna Pays the CarePoint Hospitals Well Below the Amounts Due under the Cigna Plans

106.    As detailed in Part G above, the Cigna Plans require Cigna, as the Plans' insurer and/or administrator, to reimburse out-of-network hospitals for covered expenses calculated at the rates specified in the Plans.  The starting point for the required reimbursement under the Cigna Plans is the MRC or R&C amount.

Specifically:

a.    As detailed in Part H.1 above, for Plans that follow the MRC-1 alternative, the Plans must calculate benefits using CarePoint's normal charges (and those actually billed to Cigna) or at or above the 80th percentile of the FAIR Health database.

b.    As detailed in Part H.2 above, for Plans that follow the MRC-2 alternative, the Cigna likewise must calculate benefits using CarePoint's normal charges (and those actually billed to Cigna) or the 80th percentile of the FAIR Health database.

c.    Similarly, as detailed in Part H.3 above, for Plans that follow the R&C alternative, Cigna must calculate benefits in accordance with an external standard that likewise corresponds to the FAIR Health database.

107.    Upon information and belief, the CarePoint Hospitals' normal charges as reflected on their Chargemasters are consistent with other hospitals' charges in the same or similar geographic area and, therefore, do not exceed the charges as calculated at the 80th percentile of the FAIR Health database.

108.    Thus, properly calculating the MRC or R&C amounts under the Cigna Plans should result in reimbursement at or near the CarePoint Hospitals' normal charges, less applicable cost-sharing in the form of co-insurance, co-payments, or deductibles.

109.     Moreover, as noted above, for emergent/urgent care under Cigna Plans governed by ERISA, by operation of law, the Plans require Cigna to pay CarePoint Hospitals the greatest of the three amounts specified in the Greatest of Three regulation specified above, less the amounts Defendants' Subscribers would have incurred in patient cost sharing expressed as a copayment amount or coinsurance rate that would apply if the Subscriber had received treatment from an in-network facility.

110.     As noted above, the highest amount specified in the Greatest of Three regulation is typically the amount calculated using the same methodology the Plans generally use to determine payments for out-of-network services, but excluding any in-network co-payment and co-insurance imposed, and "without reduction for out-of-network cost sharing that generally applies under the plan or health insurance coverage with respect to out-of-network services."   29 C.F.R. § 2590.715-2719A(b)(3)(i)(B).   In the case of the Cigna Plans, this amount is calculated based on the MRC or R&C amounts.

111.     Thus, again, properly calculating the amounts due under the Greatest of Three regulation likewise should result in reimbursement at or near the CarePoint Hospitals' normal charges, less applicable cost-sharing in the form of co-insurance, co-payments, or deductibles.

112.    However, instead of calculating reimbursements by utilizing the MRC or R&C amounts (and in accordance with the Greatest of Three regulation for emergency claims covered by ERISA plans), Cigna generally calculated the reimbursement owed to the CarePoint Hospitals for the Underpaid Claims as a percentage of the applicable Medicare rates, resulting in reimbursements well below the amounts the Cigna Plans required.

113.    The underpayments on each of the 4,708 Underpaid Claims are detailed more fully on Exhibit G annexed hereto.[9]   Exhibit G provides claim-specific information as to each of the underpaid claims (numbered 1 through 4,708 for litigation purposes), including:  whether the claim was for emergency or elective services; the specific CarePoint hospital providing the treatment; the CarePoint Hospitals' account number; the "ICN" number (Cigna's unique identification number); IPOP Flag (inpatient/outpatient/same day service); the date of admission and discharge; number of patient days; and, where known, the name of the relevant Plan and (if applicable), the Plan number corresponding to the number on Exhibit A.

114.    Additionally, Exhibit G sets forth, for each claim: the CarePoint Hospitals' total charges for the patient visit (which derive from Plaintiffs' Chargemasters and correspond to the "MRC"/"R&C" amounts under the Cigna

---

[9] Because Exhibit G contains information regarding medical treatment provided to specific patients, the CarePoint Hospitals have filed Exhibit G under seal.

Plans as described above); Cigna's cost-sharing percentage for the claim under the relevant Plan; the corresponding patient co-insurance amount; any applicable Plan copayments or deductibles for the claim; the amounts Cigna was required to reimburse the CarePoint Hospitals under the Plan (after subtracting any applicable co-insurance, copayments, and deductibles from the CarePoint Hospitals' charges); the amounts Cigna actually reimbursed Plaintiffs for the specific claims; and the resulting amounts by which Cigna underpaid each of the claims.   Lastly, Exhibit G contains the relevant Plan out-of-pocket maximum for each claim and, where applicable, the amounts in excess of the out-of-pocket maximum that Cigna left owing on the claim.

115.    For claims 1 through 1,149 listed on Exhibit G, the columns setting forth Cigna's cost-sharing percentages; patient co-insurance amount; any applicable Plan copayments or deductibles for the claim; and Plan out-of-pocket maximums are populated with actual Plan information for Plans 1 through 114 documented on Exhibit A.  For Claims 1,150 through 4,708 listed on Exhibit G, which involve Cigna Plans that have yet to be produced in discovery, these columns are populated with

the CarePoint Hospitals' best estimates based on the information currently in its possession, and using the averages of the figures listed on Claims 1 through 1,149.[10]

116.    The resulting underpayments for the 4,708 Underpaid Claims listed on Exhibit G total $114,640,955.27, broken down by hospital as follows:

a.      Cigna underpaid BMC by $32,033,238.82, comprising underpayments of $30,025,360.34 for 1,120 emergency claims, and $2,007,878.48 for 103 non-emergency claims;

b.      Cigna underpaid Christ Hospital by $37,879,251.42, comprising underpayments of $32,824,168.79 for 1,420 emergency claims; and $5,055,082.63 for 171 non-emergency claims;

c.      Cigna underpaid HUMC by $44,728,465.03, comprising underpayments of $35,114,856.73 for 1,692 claims for emergency services; and another $9,613,608.30 for 202 non-emergency claims.

117.    Moreover, Cigna misapplied the Plans' out-of-pocket maximums, which specify the maximum amounts (in co-insurance, deductibles, and co-payments) that the Cigna Subscriber is required to pay on a claim before Cigna reimburses the claim at 100% of the applicable "MRC" or "R&C" amount.

---

[10] The precise amounts of co-insurance, copayments, deductibles, and out-of-pocket maximums for Claims 1,150 through 4,708 must abide further discovery, including the remainder of the Plans which are uniquely in Cigna's possession.

118.     Specifically, for 2,953 claims listed on Exhibit G (2,357 emergency claims and 416 non-emergency claims), Cigna's underpayments left Cigna Subscribers exposed to MRC or R&C amounts totaling $84,077,925.09 in excess of their Plans' out-of-pocket maximums ($70,628,078.51 in excess of the out-of-pocket maximums for emergency claims; and $13,439,846.68 in excess of the out-of-pocket maximums for non-emergency claims).

119.     In misapplying the Plans' out-of-pocket maximums, Cigna violated the Plans, and it also violated the requirements of the Greatest of Three regulation discussed above, which separately requires that any out-of-pocket maximum that generally applies to out-of-network benefits must also apply to out-of-network emergency claims.  See 29 C.F.R. § 2590.715-2719A(b)(3)(ii).

## K.  Cigna Engages in Improper Self-Dealing under the Cigna Plans through its "Cost-Containment" Program

120.     Not content simply to underpay the CarePoint Hospitals' claims, Cigna engaged in self-dealing in administering the self-funded Cigna Plans for which Cigna serves as the plan administrator.

121.     Specifically, Cigna enters into arrangements with the Plans by which it purports to charge the Plans a fee calculated as a percentage of the "savings" Cigna or its third-party supposedly achieved for the Plans in processing the claims.

122.     Upon information and belief, Cigna has entered into such arrangements with respect to many of the Cigna Plans at issue in this case, including Plans 7, 10,

13, 14, 16, 26, 29, 30, 35, 40, 52, 54, 56, 61, 62, 65, 68, 74, 77, 78, 84, 86, 88, 89, 90, 91, 103, 106, 108, 109, 113, and 114 listed on Exhibit A.

123.    Although Cigna leads the Plans to believe that that it is achieving the "savings" through legitimate means, in reality, Cigna calculates the "savings" based on the difference between the amounts of the health care provider's gross charges and the amounts that Cigna actually reimbursed the provider.  Cigna applies and retains (for itself and its business partners) the "savings" it allegedly achieved, regardless of whether the underpayments and resultant "savings" comply with the terms of the Plans.  Thus, Cigna's "cost-containment" program creates a built-in incentive for Cigna and its business partners to have the Plans reimburse valid health care claims as little as possible and well below what the Plans actually require.

\* \* \*

124.    All available appeals avenues under the Cigna Plans applicable to the Underpaid Claims at issue have been exhausted.  This action was timely commenced within six years after the CarePoint Hospitals were notified by Defendants that Defendants were rejecting or dramatically underpaying the Underpaid Claims for the services that the CarePoint Hospitals provided to Defendants' Subscribers, and otherwise within six (6) years after each of the Underpaid Claims against Defendants accrued.

## CAUSES OF ACTION

## COUNT ONE
### (Violations of ERISA § 502(a)(1)(B))

125.    Plaintiffs re-allege and incorporate by reference the allegations of the foregoing paragraphs as if fully set forth herein.

126.    The CarePoint Hospitals have standing to pursue claims under ERISA as the assignees and authorized representatives of the Cigna Subscribers' claims under the Plans.

127.    As the assignees of the Defendants' Subscribers, the CarePoint Hospitals are entitled to payment under the ERISA Plans for the hospital services provided to the Cigna Subscribers at the CarePoint Hospitals.

128.    Upon information and belief, many of Plans did not prohibit the Cigna Subscribers from assigning their rights to benefits under the Plans to the CarePoint Hospitals, including the right of direct payment of benefits under the Plans to the CarePoint Hospitals.

129.    Moreover, to the extent that any of the Plans prohibited the assignment of benefits to the CarePoint Hospitals, Defendants have waived any purported anti-assignment provisions, have ratified the assignment of benefits to the CarePoint Hospitals, and/or are estopped from using any purported anti-assignment provisions against the CarePoint Hospitals due to Defendants' course of dealing with and

statements to the CarePoint Hospitals as out-of-network providers, discussed more fully above.

130.   And to the extent that the Plans prohibited the assignment of benefits to the CarePoint Hospitals, any such purported anti-assignment prohibitions are unenforceable as, among other things, contrary to public policy, as adhesion contracts, and/or due to a lack of privity with the CarePoint Hospitals.

131.   Pursuant to 29 U.S.C. § 1132(a)(1)(B), a participant or beneficiary (including assignees such as the CarePoint Hospitals) may commence a civil action to recover benefits due under the terms of a Plan, to enforce the beneficiary's rights under the Plan, or to clarify rights to future benefits under the terms of the Plan.

132.   As detailed above, the Cigna Plans require Cigna, as the Plans' insurer and/or administrator, to reimburse out-of-network hospitals for covered expenses calculated at the rates specified in the Plans, which are derived from the Plans' MRC or R&C amounts, less patient responsibility amounts such as co-insurance, deductibles, and co-payments under the Plans.

133.   As detailed above, the Plans' MRC and R&C amounts generally equate to the 80th percentile of the FAIR Health database.   These amounts, in turn, correspond to the charges derived from the CarePoint Hospitals' Chargemasters that the CarePoint Hospitals billed to Cigna.

134.   Moreover, as noted above, for emergent/urgent care under Cigna Plans

governed by ERISA, by operation of law, the Plans require Cigna to pay CarePoint Hospitals the greatest of the three amounts specified in 29 C.F.R. § 2590.715-2719A(b)(3)(i), less the amounts Defendants' Subscribers would have incurred in patient cost sharing expressed as a copayment amount or coinsurance rate that would apply if the Subscriber had received treatment from an in-network facility. As applied to the Cigna Plans, this regulation generally requires the Cigna Plans to calculate the out-of-network emergency reimbursements based on the MRC or R&C methodologies that the Plans generally use to calculate out-of-network reimbursements. See 29 C.F.R. § 2590.715- 2719A(b)(3)(i)(B).

135.    As described more fully above and on Exhibit G, Cigna violated the Cigna Plans' requirements, and the Greatest of Three regulation, by reimbursing the CarePoint Hospitals well below the MRC or R&C amounts, less patient responsibility amounts such as co-insurance, deductibles, and co-payments under the Plans.

136.    Moreover, as detailed on Exhibit G, the vast majority of the Cigna Plans contain out-of-pocket maximums, which specify the maximum amounts (in co-insurance, deductibles, and co-payments) that the Cigna Subscriber is required to pay on a claim before Cigna reimburses the claim at 100% of the applicable "MRC" or "R&C" amount.

137.    As described more fully on Exhibit G, Cigna misapplied the Plans' out-of-pocket maximums and, in doing so, left thousands of Cigna Subscribers exposed to amounts well in excess of their Plans' out-of-pocket maximums.

138.    In misapplying the Plans' out-of-pocket maximums, Cigna violated the Plans, and it also violated the Greatest of Three regulation discussed above, which separately requires that any out-of-pocket maximum that generally applies to out-of-network benefits must also apply to out-of-network emergency claims.  See 29 C.F.R. § 2590.715-2719A(b)(3)(ii).

139.    Under 29 U.S.C. § 1132(a)(1)(B), the CarePoint Hospitals are entitled to recover unpaid/underpaid benefits from Defendants on all of the Underpaid Claims.  The CarePoint Hospitals are also entitled to recover their reasonable attorneys' fees and costs under 29 U.S.C. § 1132(g).

## COUNT TWO
### (Violations of ERISA § 502(a)(3) by Violating ERISA Fiduciary Duties of Loyalty and Due Care)

140.    Plaintiffs re-allege and incorporate by reference the allegations of the foregoing paragraphs as if fully set forth herein.

141.    Pursuant to 29 U.S.C. § 1132(a)(3), a civil action may be brought by "a participant, beneficiary, or fiduciary to (A) enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other

appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan."

142.    Defendants exercised discretion, control, authority and oversight in determining whether Plan benefits would be paid and the amounts of Plan benefits that would be paid and, thus, are ERISA fiduciaries within the meaning of 29 U.S.C. § 1002(21).

143.    As ERISA fiduciaries, Defendants owed the CarePoint Hospitals a duty of loyalty, defined as an obligation to make decisions in the interest of its beneficiaries and to avoid self-dealing or financial arrangements that benefit the fiduciary at the expense of members, in accordance with ERISA § 404(a)(l)(A), 29 U.S.C. § 1104(a)(l)(A), and ERISA § 406, 29 U.S.C. § 1106.  Thus, Defendants could not make benefit determinations for the purpose of enriching themselves and their business partners at  the expense of the Defendants' Subscribers or the CarePoint Hospitals, as their assignees.

144.    As described more fully above, Cigna entered into an arrangement with many of the Cigna Plans by which it processed Underpaid Claims using its so-called "cost-containment" program.  Under this "cost-containment" program, Cigna paid itself and its third-party business partners "fees" based on a percentage of the so-called "savings" Cigna achieved on specific Underpaid Claims – with the "savings" calculated based on the amounts by which Cigna underpaid the claims at issue.

145.     Cigna's "cost-containment" program creates a built-in incentive for Cigna and its business partners to have the Plans reimburse valid health care claims as little as possible and well below what the Plans actually require.

146.     Thus, through the use of Cigna's "cost-containment" program, Cigna violated its ERISA fiduciary duties to avoid self-dealing and financial arrangements that benefitted Cigna and its third-party beneficiaries at the expense of its beneficiaries, in violation of 29 U.S.C. §§ 1104(a)(1)(A) and 1106(a)(1)(D) and (b)(1)).

147.     The CarePoint Hospitals have standing to pursue claims under ERISA as assignees and authorized representatives of the Defendants' Subscribers.

148.     The CarePoint Hospitals are entitled to equitable relief to remedy Defendants' violations of their fiduciary duties under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3).  The CarePoint Hospitals are also entitled to recover their reasonable attorneys' fees and costs under 29 U.S.C. § 1132(g).

## COUNT THREE
### (Breach of Contract – non-ERISA)

149.     Plaintiffs re-allege and incorporate by reference the allegations of the foregoing paragraphs as if fully set forth herein.

150.     To the extent that some of the Plans are not employee welfare benefit plans governed by ERISA, they are nonetheless valid and enforceable insurance contracts.

151.    As set forth more fully above, all of the Plans require payment of medical expenses incurred by the Cigna Subscribers at the rates specified in the Plans.  Further, under the terms of the Plans, the Cigna Subscribers are entitled to coverage for the services that they received from the CarePoint Hospitals.

152.    By virtue of the AOB Contracts executed by the Cigna Subscribers, the CarePoint Hospitals were assigned the right to receive payment under the Plans for the services rendered to the Cigna Subscribers.  Pursuant to said AOB Contracts, Defendants are contractually obligated to pay the CarePoint Hospitals for these services.

153.    Defendants failed to make payment of benefits to the CarePoint Hospitals in the manner and amounts required under the terms of the Plans, as described more fully above.

154.    Among other things, as discussed more fully above, Cigna's reimbursement amounts were well below the MRC and R&C amounts calculated under the Plans, less applicable co-insurance, deductibles, and copayments, and thus, well below the amounts the Cigna Plans required.

155.    Moreover, as discussed above, Cigna misapplied the Plans' out-of-pocket maximums by leaving thousands of Cigna Subscribers exposed to balances on the Underpaid Claims well in excess of the Plans' out-of-pocket maximums.

156.    As the result of Defendants' failures to comply with the terms of the

Plans, the CarePoint Hospitals, as assignees, have suffered damages and lost benefits for which they are entitled to recover damages from Defendants, including unpaid benefits, restitution, interest, and other contractual damages sustained by the CarePoint Hospitals.

## COUNT FOUR
### (Breach of the Duty of Good Faith and Fair Dealing – non-ERISA)

157.    Plaintiffs re-allege and incorporate by reference the allegations of the foregoing paragraphs as if fully set forth herein.

158.    As set forth more fully above, if any of the Plans are not employee welfare benefit plans governed by ERISA, they are nonetheless valid and enforceable insurance contracts. As such, the Plans contain an implied duty of good faith and fair dealing.

159.    Defendants, as the obligors under the Plans, owed the Cigna Subscribers a duty of good faith and fair dealing with respect to said Plans.

160.    As set forth more fully above, the Cigna Subscribers received health care services at the CarePoint Hospitals and executed AOB Contracts, among other documents, in which they assigned to the CarePoint Hospitals their right to benefits under the Plans for the services that the CarePoint Hospitals provided to the Cigna Subscribers.

161. By virtue of these assignments, Defendants also owe this duty of good faith and fair dealing to the CarePoint Hospitals.

162. As described more fully above, Defendants breached their duty of good faith and fair dealing owed to the CarePoint Hospitals, as assignees of rights and benefits under the Plans, by arranging to have many of the Plans participate in Cigna's "cost-containment" program, which creates a built-in incentive for Cigna and its business partners to have the Plans reimburse valid health care claims as little as possible and well below what the Plans actually require.

163. Defendants' conduct in derogation of their duty of good faith and fair dealing under the Plans has deprived the CarePoint Hospitals of their reasonable expectations and benefits as assignees of benefits under the Plans, warranting monetary damages.

## COUNT FIVE
### (*Quantum Meruit*—Non-ERISA)

164. Plaintiffs re-allege and incorporate by reference the allegations of the foregoing paragraphs as if fully set forth herein.

165. As set forth more fully above, if any of the Underpaid Claims arise under Plans that are not employee welfare benefit plans governed by ERISA, and/or to the extent that any of these non-ERISA plans do not confer contractual rights upon the CarePoint Hospitals, CarePoint is nonetheless entitled to recover from Cigna under the doctrine of *Quantum Meruit*.

- 56 -

166.    Under New Jersey law, a cause of action for *Quantum Meruit* requires (1) the performance of services in good faith, (2) the acceptance of the services by the person to whom they are rendered, (3) an expectation of compensation therefor, and (4) the reasonable value of the services.

167.    To comply with their ethical and legal obligations under federal and New Jersey law, Plaintiffs provided emergency medical treatment and services to Cigna Subscribers in good faith during the Claim Period.

168.    Cigna could not lawfully prevent its members from seeking emergency medical care from the CarePoint Hospitals.   Thus, the parties were, in effect, compelled to do business with each other.

169.    Given the nature of these relationships, an equitable obligation arises to account for the value of the services Plaintiffs provided to Cigna Subscribers.

170.    Cigna Subscribers accepted the treatment and services that Plaintiffs provided to them.

171.    At the time Plaintiffs treated Cigna Subscribers, Plaintiffs reasonably expected to be compensated for the medical treatment and services that Plaintiffs provided to Cigna Subscribers and, accordingly, submitted claims to Cigna for payment for this treatment and services, listed on Exhibit G.

172.    The reasonableness of Plaintiffs' expectation is underscored by the state and federal laws described more fully above requiring Cigna to reimburse Plaintiffs

promptly and fairly.

173.    Thus, Defendants are obligated to reimburse the Plaintiffs for the reasonable value of the services they provided.

174.    By providing treatment and services to Cigna Subscribers, Plaintiffs have also directly benefitted Cigna. Specifically, under its contracts with the Cigna Plans it administers, Cigna earns "cost-containment fees" calculated as a sizable percentage of the amounts by which Cigna underpays the CarePoint Hospitals.

175.    The reasonable value of the treatment and services that Plaintiffs rendered to Cigna Subscribers is the full amount of their billed charges.

176.    As set out more fully above, Cigna has drastically underpaid Plaintiffs and, therefore, has not reimbursed Plaintiffs for the reasonable value of the treatment and services that Plaintiffs rendered to Cigna Subscribers.

177.    Accordingly, under the doctrine of *Quantum Meruit*, Cigna is liable to Plaintiffs for the full amount of Plaintiffs' billed charges on the Underpaid Claims during the Claim Period, less any amounts actually paid by Cigna and any applicable Patient Responsibility Amounts.

## COUNT SIX
### *(Violation of New Jersey Health Claims*
### *Authorization, Processing and Payment Act ("HCAPPA")*
### *—Non-ERISA and Fully-Insured ERISA Claims)*

178.    Plaintiffs re-allege and incorporate by reference the allegations of the foregoing paragraphs as if fully set forth herein.

179.   With respect to the Cigna Plans other than self-funded Cigna Plans governed by ERISA, Cigna's processing of CarePoint's Claims is governed by the prompt payment requirements of HCAPPA.

180.   HCAPPA requires health insurers such as Cigna to pay health care providers' claims promptly, provided that the claims meet the criteria for payment set forth in *N.J.S.A.* 17B:26-9.1(d)(1), *N.J.S.A.* 17B:27-44.2(d)(1) and *N.J.S.A.* 26:2J-8.1(d)(1).

181.   Specifically, for out-of-network emergency claims governed by the OON Act post August 30, 2018 — such as the claims for the emergency treatment the CarePoint Hospitals provided Cigna Subscribers between August 30, 2018 and May 31, 2021 — New Jersey law requires that such claims be paid in full no more than 50 days after electronic submission, except to the extent disputed in accordance with the procedures of the OON Act. *See N.J.S.A.* 26:2SS-9.

182.   Plaintiffs' claims for the emergency treatment they provided to Cigna Subscribers since May August 30, 2018, meet all the criteria for payment under HCAPPA, *N.J.S.A.* 17B:26-9.1(d)(1), *N.J.S.A.* 17B:27-44.2(d)(1) and *N.J.S.A.* 26:2J-8.1(d)(1).   As described more fully above, on the dates the services were provided, Cigna covered the out-of-network emergency services Plaintiffs' physicians provided to Cigna Subscribers, and Plaintiffs' agents submitted the claims to Cigna on the appropriate claim forms.

183.    However, also as described more fully above, Cigna failed to remit full reimbursement of Plaintiffs' charges for healthcare services, or provide a written explanation for the failure to pay all or a portion of such claims, within the statutorily proscribed time frames under HCAPPA or the OON Act.

184.    Moreover, as described more fully above, Cigna failed to provide written notice specifying that that Plaintiffs' out-of-network emergency claims were incomplete or contained incorrect information, that Cigna disputed the amounts claimed in whole or in part, or that there was strong evidence of fraud, as HCAPPA requires of any carrier that fails to timely pay a claim for reimbursement. *N.J.S.A.* 17B:26-9.1(d)(2), *N.J.S.A.* 17B:27-44.2(d)(2), or *N.J.S.A.* 26:2J-8.1(d)(2)). Nor did Cigna seek to dispute any of Plaintiffs' out-of-network claims in accordance with the OON Act.

185.    Cigna's failure to timely pay the full amounts due to Plaintiffs for their out-of-network emergency claims for services provided during the relevant portion of the Claim Period has resulted overdue payments under HCAPPA.

186.    Although HCAPPA does not expressly provide for a private right of action, and although some Courts in this District have declined to infer one, recognizing a private right of action furthers HCAPPA's statutory purpose by allowing health care providers, for whose benefit HCAPPA was enacted, to recover interest on overdue payments under HCAPPA.

187.    By reason of the foregoing, Plaintiffs are entitled to recover from Cigna the full underpaid and unpaid amounts on all of Plaintiffs' out-of-network emergency claims for services during the Claim Period, together with statutory interest in the amount of 12% per annum, *N.J.S.A.* 17B:26-9.1(d)(9), *N.J.S.A.* 17B:27-44.2(d)(9) and *N.J.S.A.* 26:2J-8.1(d)(9).

## CONDITIONS PRECEDENT

188.    All conditions precedent have been performed or have occurred.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the CarePoint Hospitals hereby request a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, the CarePoint Hospitals demand judgment in their favor against Defendants as follows:

A.    Unpaid/underpaid benefits from Defendants due under the Plans under 29 U.S.C. § 1132(a)(1)(B);

B.    Declaring that Defendants violated their fiduciary duties under § 404 of ERISA, 29 U.S.C. § 1104, and awarding appropriate equitable relief to remedy these violations under 29 U.S.C. § 1132(a)(3), including disgorgement of all so-called "cost-containment" fees improperly collected by Cigna and its business partners and withheld from Plaintiffs;

C.      Awarding Plaintiffs their reasonable attorneys' fees and costs based on Defendants' ERISA violations, under 29 U.S.C. § 1132(g);

D.      Insofar as any of the Plans are not covered by ERISA, awarding contractual damages in the form of unpaid/underpaid benefits from Defendants due under those non-ERISA Plans;

E.      Insofar as any of the Plans are not covered by ERISA, awarding damages arising out of Defendants' breaches of the covenant of good faith and fair dealing arising under those non-ERISA Plans;

F.      Insofar as any of the Underpaid Claims do not arise under Plans covered by ERISA, awarding *Quantum Meruit* damages based on the fair value of the services rendered to Defendants' Subscribers with respect to these non-ERISA claims, less any amounts actually paid by Cigna and any applicable Patient Responsibility amounts;

G.      Otherwise awarding restitution for payments improperly withheld by Defendants;

H.      Awarding statutory interest on all Underpaid Claims to which HCAPPA applies in the amount of 12% per annum, *N.J.S.A.* 17B:26-9.1(d)(9), *N.J.S.A.* 17B:27-44.2(d)(9) and *N.J.S.A.* 26:2J-8.1(d)(9)

I.      Awarding costs of suit;

J.      Awarding pre-judgment and post-judgment interest as provided by common law, federal or state statute or rule, or equity; and

K.      Awarding all other relief to which Plaintiffs are entitled.

Respectfully submitted,

**K&L GATES, LLP**

By: /s/ Anthony P. La Rocco
Anthony P. La Rocco
anthony.larocco@klgates.com
One Newark Center, 10th Floor
Newark, New Jersey 07102
(973) 848.4104  Telephone
(973) 556.1584 Facsimile

***Attorneys for Plaintiffs***
Hudson Hospital OPCO, LLC, d/b/a
CarePoint Health—Christ Hospital; IJKG,
LLC, IJKG PROPCO LLC and IJKG OPCO
LLC, d/b/a CarePoint Health—Bayonne
Medical Center; and HUMC OPCO LLC,
d/b/a CarePoint Health—Hoboken
University Medical Center

Dated:  November 29, 2023

## CERTIFICATION UNDER LOCAL CIVIL RULE 11.2

I certify that the matter in controversy is not the subject matter of any other action pending in any court or of any pending arbitration or administrative proceeding.

Respectfully submitted,

**K&L GATES, LLP**

By: /s/ Anthony P. La Rocco
Anthony P. La Rocco
anthony.larocco@klgates.com
One Newark Center, 10th Floor
Newark, New Jersey 07102
(973) 848.4104  Telephone
(973) 556.1584 Facsimile

***Attorneys for Plaintiffs***
Hudson Hospital OPCO, LLC, d/b/a
CarePoint Health—Christ Hospital; IJKG,
LLC, IJKG PROPCO LLC and IJKG OPCO
LLC, d/b/a CarePoint Health—Bayonne
Medical Center; and HUMC OPCO LLC,
d/b/a CarePoint Health—Hoboken
University Medical Center

Dated:  November 29, 2023

## LOCAL CIVIL RULE 201.1 CERTIFICATION

I certify under penalty of perjury that the matter in controversy is not eligible for compulsory arbitration because the damages recoverable by Plaintiffs exceed the sum of $150,000, exclusive of interest and costs.

Respectfully submitted,

**K&L GATES, LLP**

By: /s/ Anthony P. La Rocco
Anthony P. La Rocco
anthony.larocco@klgates.com
One Newark Center, 10th Floor
Newark, New Jersey 07102
(973) 848.4104  Telephone
(973) 556.1584 Facsimile

***Attorneys for Plaintiffs***
Hudson Hospital OPCO, LLC, d/b/a
CarePoint Health—Christ Hospital; IJKG,
LLC, IJKG PROPCO LLC and IJKG OPCO
LLC, d/b/a CarePoint Health—Bayonne
Medical Center; and HUMC OPCO LLC,
d/b/a CarePoint Health—Hoboken
University Medical Center

Dated:  November 29, 2023